EMPIRE STATE CATTLE COMPANY *v.* ATCHISON, TO-
PEKA & SANTA FE RAILWAY COMPANY.

MINNESOTA AND DAKOTA CATTLE COMPANY *v.* SAME.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH
CIRCUIT.

Nos. 178, 179.   Argued March 13, 16, 1908.—Decided May 4, 1908.

The fact that each party asks for a peremptory instruction to find in his
favor does not submit the issues of fact to the court so as to deprive either
party of the right to ask other instructions and to except to the refusal to
give them, or to deprive him of the right to have questions of fact submit-
ted to the jury where the evidence on the issues joined is conflicting or
divergent inferences may be drawn therefrom. *Beuttell* v. *Magone,* 157
U. S. 154, distinguished.

Although a peremptory instruction of the trial court cannot be sustained
on the ground that both parties having asked a peremptory instruction
the case was taken from the jury notwithstanding special instructions
had been asked by the defeated party, the verdict will be sustained if the
evidence was of such a conclusive character that it would have been the
duty of the court to set aside the verdict had it been for the other party.

The Kansas City flood of 1903 was so unexpected and of such an unprece-
dented character that a railroad company was not, under the circum-
stances of this case, chargeable with negligence in sending cattle trains
*via* Kansas City or for failing to move the cattle from the stock yards
before the climax of the flood.

The duty that may rest on a carrier under normal conditions to transport
merchandise by a particular, and the most advantageous, route is re-

strained and limited by the right of the carrier, in case of necessity, to resort to such other reasonable direct route as may be available under the existing conditions to carry the freight to its destination, and if such necessity exists, in the absence of negligence in selecting the changed route, the carrier is not responsible for damages resulting from the change even if such change may be, in law, a concurring and proximate cause of such damages.
147 Fed. Rep. 457.

THE facts are stated in the opinion.

*Mr. James S. Botsford,* with whom *Mr. Buckner F. Deatherage, Mr. Odus G. Young* and *Mr. R. E. Ball* were on the brief, for petitioners:

The court should have submitted the question of negligence to the jury, it being the settled law of the Federal appellate courts that it is the province of the jury to determine that question. *Railroad Co.* v. *Stout,* 17 Wall. 657; *Union Pacific Ry. Co.* v. *McDonald,* 152 U. S. 262, 275; *Marande* v. *R. R. Co.,* 184 U. S. 173.

The question of proximate cause was also a question for the jury, and should have been submitted to them. *Milwaukee & St. Paul Ry. Co.* v. *Kellogg,* 94 U. S. 469; *Webb* v. *Rome, Watertown & Ogdensburg R. R. Co.,* 49 N. Y. 420; *Pennsylvania R. R. Co.* v. *Hope,* 80 Pa. St. 373; *Kellogg* v. *The Chicago & Northwestern R. R. Co.,* 26 Wisconsin, 224; *Perley* v. *The Eastern R. R. Co.,* 98 Massachusetts, 414; *Higgins* v. *Dewey,* 107 Massachusetts, 404; *Tent* v. *The Toledo, Peoria & Warsaw R. R. Co.,* 49 Illinois, 349.

Contributory negligence of the carrier renders it liable, notwithstanding the act of God relied on by it as the cause. *Sweezey* v. *Philadelphia,* 64 Pa. St. 106; *Helbling* v. *Cemetery Co.,* 201 Pa. St. 171; *Morrison* v. *Davis,* 20 Pa. St. 176; *Williams* v. *Grant,* 1 Connecticut, 487; *Wallace* v. *Clayton,* 42 Georgia, 443; *Railroad Co.* v. *White,* 88 Georgia, 805; *Merritt* v. *Earle,* 29 N. Y. 115, 116f; *Michaels* v. *Railroad Co.,* 30 N. Y. 564, 570; *Bibb Broom Corn Co.* v. *A., T. & S. F. Ry. Co.,* 102 N. W. Rep. (Minn.) 709; *Railroad Co.* v. *Curtiss,* 80 Illinois, 324; *Wald* v.

*Railroad Co.*, 162 Illinois, 545; *Blodgett* v. *Abbott*, 72 Wisconsin, 516; *Nelson* v. *Railway Co.*, 72 Pac. Rep. (Mont.) 643, 651; *Steamboat Co.* v. *Tiers*, 24 N. J. L. 697; *Railroad Co.* v. *David*, 6 Heisk, 261; *McGraw* v. *Railroad Co.*, 18 W. Va. 361; *Smith* v. *Railway Co.*, 91 Alabama, 455; *Coosa Steamboat Co.* v. *Barclay*, 30 Alabama, 12, 127; *Nugent* v. *Smith*, 1 C. P. Div. 19, 423; 1 Am. & Eng. Enc. of Law (2d ed.), 595; 5 Am. & Eng. Enc. of Law (2d ed.), 234; Hutchinson on Carriers, §§ 181, 187, 188; 6 Enc. of L. & P., 377–384; *Strouss* v. *Railway Co.*, 17 Fed. Rep. 209 , 212; *Caldwell* v. *Southern Exp. Co.*, 4 Fed. Cas. 1036, No. 2,303; *Thompkins* v. *Duchess of Ulster*, 24 Fed. Cas. 32, No. 14,087*a;* *Southern Pac. Co.* v. *Schoer*, 52 C. C. A. 269, 274; *Newport News Co.* v. *United States*, 9 C. C. A. 579; *Clark* v. *Barnwell*, 12 How. 272, 280; *Holladay* v. *Kennard*, 12 Wall. 254; *Gleason* v. *Railroad Co.*, 140 U. S. 433; *The Majestic*, 166 U. S. 376, 386; *Gratiot W. H. Co.* v. *Railway Co.*, 102 S. W. Rep. 11.

By the deviation of the cattle from Strong City they were taken from a safe place into what was then known to be a hazardous place. If the deviation from Strong City to Kansas City was made without the consent of the shippers, then, according to all the authorities, it was wrongful, and the company is liable on that ground alone. *Crosby* v. *Fitch*, 12 Connecticut, 410, 420, 423; *Railroad Co.* v. *Beck*, 125 Pa. St. 620; *Phillips* v. *Bingham*, 26 Georgia, 617; *Railroad Co.* v. *Cole*, 68 Georgia, 623; *Cassilay* v. *Young*, 4 B. Mon. 265; *Sager* v. *Railroad Co.*, 31 Maine, 228, 238; *Railroad Co.* v. *Washburn*, 22 Ohio St. 324; *Express Co.* v. *Smith*, 33 O. St. 511; *Brown Co.* v. *Railroad Co.*, 63 Minnesota, 546; *Hendricks* v. *Steamship Co.*, 18 La. Ann. 353; *Hastings* v. *Pepper*, 11 Pick. 41; *Proctor* v. *Railroad Co.*, 105 Massachusetts, 512; *Railway Co.* v. *Allison*, 59 Texas, 193; *Johnson* v. *Railway Co.*, 33 N. Y. 610; *Goodrich* v. *Thompson*, 44 N. Y. 324; *Maghee* v. *Railroad Co.*, 45 N. Y. 514; *Keeney* v. *Railway Co.*, 47 N. Y. 525; *Robertson* v. *Nat. S. S. Co.*, 14 N. Y. Supp. 313; *Seavey Co.* v. *Union Trans. Co.*, 106 Wisconsin, 394; *Railway Co.* v. *Brichetto*, 72 Mississippi, 891; *Railroad Co.*

v. *Odil*, 96 Tennessee, 61; *Mer. Dis. Tr. Co.* v. *Kahn*, 76 Illinois, 520; 1 Am. & Eng. Enc. of Law (2d ed.), 594; 5 Am. & Eng. Enc. of Law (2d ed.), 422, 426; Hutchinson on Carriers, §§ 190, 191; Lawson on Bailments, § 127; 6 Cyc. of Law & Pro. 383; *Marsh* v. *Union Pac. R. R. Co.*, 9 Fed. Rep. 873; *Insurance Co.* v. *LeRoy*, 7 Cranch, 26; *Hostetter* v. *Park*, 137 U. S. 30, 40; *Constable* v. *Steamship Co.*, 154 U. S. 51, 61; *Texas & P. Ry. Co.* v. *Eastin* (Texas), 102 S. W. Rep. 105.

*Mr. Gardiner Lathrop* and *Mr. Robert Dunlap*, with whom *Mr. William R. Smith* and *Mr. C. Angevine* were on the brief, for respondent:

As each party asked for a peremptory instruction in its favor and argued and submitted such instructions together to the court, and the court determined the same, it must be assumed that they both submitted the case to the court to find the facts upon the assumption that under the evidence there was only involved a question of law as to liability or nonliability. *Beuttell* v. *Magone*, 157 U. S. 154; *Bankers' Mutual Casualty Co.* v. *State Bank of Goffs*, 150 Fed. Rep. 78; *City of Defiance* v. *McGonigale*, 150 Fed. Rep. 689; *Johnson's Admr.* v. *C. & O. Ry. Co.*, 21 S. E. Rep. 238; *S. C.*, 91 Virginia, 171; *Insurance Co.* v. *Wisconsin Central Ry.*, 134 Fed. Rep. 794, 798; *Empire State Cattle Co.* v. *A., T. & S. F. Ry. Co.*, 147 Fed. Rep. 459; *Nashville, C. & St. L. Ry. Co.* v. *Sansom*, 84 S. W. Rep. 615, 616; *S. C.*, 113 Tennessee, 683.

Nevertheless, as the evidence was of such a conclusive character in favor of the defendant that the trial court would have been obliged to set aside a verdict in favor of plaintiffs, it therefore properly directed a verdict for the defendant. This is true not only in respect to any question of alleged negligence, but also in respect to the question whether such alleged negligence was the proximate cause of the damage and also whether there was any wrongful deviation from instructions, if any, of the shipper, or from any alleged agreement of defendant. *West* v. *Camden*, 135 U. S. 508; *Southern Pacific Co.* v. *Pool*, 160

U. S. 440; *Goodlander Mill Co.* v. *Standard Oil Co.*, 63 Fed. Rep. 400; *Christenson* v. *Metropolitan Street Ry. Co.*, 137 Fed. Rep. 708; *Bowditch* v. *Boston*, 101 U. S. 18; *Patton* v. *Texas & Pacific Ry. Co.*, 179 U. S. 658.

The overflowing of the Kansas City stock yards by this flood being sudden, extraordinary and unprecedented, defendant cannot be held liable for damages caused in consequence thereof as it could not be expected to anticipate the unusual character of the same. The antecedent delay at Strong City and Wellington, as well as the taking of the cattle to and depositing the same in the Union stock yards for the connecting carrier was not culpable negligence, as it could not be anticipated at the time that the disaster complained of was likely to result from any of the preceding acts of the defendant. Such a disaster was not then probable. *Lightfoot* v. *St. Louis & San Francisco Ry. Co.*, 104 S. W. Rep. 483; *Insurance Co.* v. *Boon*, 95 U. S. 130, 131; *Daniel* v. *Directors &c. of Metropolitan Ry. Co.*, L. R., 5 Eng. & Ir. App. (House of Lords) 45; *Milwaukee &c. Ry. Co.* v. *Kellogg*, 94 U. S. 475; *Kreigh* v. *Westinghouse, Church, Kerr & Co.*, 152 Fed. Rep. 120; *Cole* v. *German Savings &c. Society*, 124 Fed. Rep. 113; *Stetanowski* v. *Chain Belt Co.*, 109 N. W. Rep. 532; *Mo. Pac. Ry.* v. *Columbia*, 65 Kansas, 390; *S. C.*, 69 Pac. Rep. 338; *Morrison* v. *Davis*, 20 Pa. St. 175; *Railroad Company* v. *Reeves*, 10 Wallace, 176; *C., St. P. M. & O. Ry.* v. *Elliott*, 55 Fed. Rep. 949–952; *Scheffer* v. *Railroad Company*, 105 U. S. 249; *Glassey* v. *Worcester Con. St. Ry. Co.*, 185 Massachusetts, 315; *S. C.*, 70 N. E. Rep. 199; *Stone* v. *B. & A. R. R. Co.*, 171 Massachusetts, 536; *S. C.*, 51 N. E. Rep. 1; Vol. 7, Rose's Notes to U. S. Rep., Reeves Case, pp. 297, 298; Hutchinson on Carriers, 2d ed. by Meachem, §§ 193–195; 5 Am. & Eng. Enc. of Law (2d ed.), 259, 260.

As during the transit over defendant's lines a necessity arose which showed that the cattle could not be delivered by it to the Burlington road at Atchison, as it had intended to do, without further delays likely to injure the shipment, it was in any aspect of the case justified in arranging for delivery to

the Missouri Pacific at Kansas City and in transporting the cattle to the Union stock yards at that place. In doing so there would have been no wrongful deviation even if the contract had expressly provided for carriage over its own line to Atchison. It was simply acting in accordance with a well-established custom. *Hostetter* v. *Park*, 137 U. S. 31, 40; *M., K. & T. R. R. Co.* v. *Olive*, 23 S. W. Rep. 526; 1 Am. & Eng. Enc. of Law (2d ed.), 1063; Ray's Negligence of Imposed Duties, 317; *International &c. Ry. Co.* v. *Wentworth*, 27 S. W. Rep. 680; *Propeller Niagara* v. *Cordes*, 21 How. 7; *Reade* v. *Comm. Ins. Co.*, 3 Johns. 352; *Foster* v. *Great Western Ry. Co.*, L. R. (1904), 2 K. B. Div. 306.

MR. JUSTICE WHITE delivered the opinion of the court.

With the object of saving them from destruction by the flood which engulfed portions of Kansas City on May 31 and the first week of June, 1903, more than three thousand head of cattle belonging to the petitioners, which were in the Kansas City stock yards, were driven and crowded upon certain overhead viaducts in those yards. For about seven days, until the subsidence of the flood, they were there detained and could not be properly fed and watered. Many of them died and the remainder were greatly lessened in value. These actions were brought by the petitioners to recover for the loss so sustained upon the ground that the cattle were in the control of the defendant railway company as a common carrier, and that the loss sustained was occasioned by its negligence.

The railway company defended in each case upon the ground that before the loss happened it had delivered the cattle to a connecting carrier, but that if the cattle were in its custody it was without fault, and the damage was solely the result of an act of God, that is, the flood above referred to.

As the cases depended upon substantially similar facts and involved identical questions of law, they were tried together, and at the close of the evidence the trial court denied a peremp-

tory instruction asked on behalf of the plaintiffs, and gave one asked on behalf of the railway company. 135 Fed. Rep. 135.

While there was some contention in the argument as to what took place concerning the requests for peremptory instructions, we think the bill of exceptions establishes that at the close of the evidence the plaintiffs requested a peremptory instruction in their favor, and on its being refused duly excepted and asked a number of special instructions, which were each in turn refused, and exceptions were separately reserved, and the court then granted a request for a peremptory instruction in favor of the railway company, to which the plaintiffs excepted.

On the writs of error which were prosecuted from the Circuit Court of Appeals for the Eighth Circuit that court affirmed the judgment on the ground that as both parties had asked a peremptory instruction the facts were thereby submitted to the trial judge, and hence the only inquiry open was whether any evidence had been introduced which tended to support the inferences of fact drawn by the trial judge from the evidence. One of the members of the Circuit Court of Appeals (Circuit Judge Sandborn) did not concur in the opinion of the court, because he deemed that as the request for peremptory instruction made on behalf of plaintiffs was followed by special requests seeking to have the jury determine the facts, the asking for a peremptory instruction did not amount to a submission of the facts to the court so as to exclude the right to have the case go to the jury in accordance with the subsequent special requests. He, nevertheless, concurred in the judgment of affirmance, because, after examining the entire case, he was of opinion that prejudicial error had not been committed, as the evidence was insufficient to have justified the submission of the issues to the jury. 147 Fed. Rep. 457.

The cases are here because of the allowance of writs of certiorari. They present similar questions of fact and law, were argued together and are, therefore, embraced in one opinion. The scope of the inquiry before us needs, at the outset, to be accurately fixed. To do so requires us to consider the question

which gave rise to a division of opinion in the Circuit Court of
Appeals. If it be that the request by both parties for a per-
emptory instruction is to be treated as a submission of the cause
to the court, despite the fact that the plaintiffs asked special
instructions upon the effect of the evidence then, as said in
*Beuttell* v. *Magone,* 157 U. S. 154, "the facts having been thus
submitted to the court, we are limited in reviewing its action,
to a consideration of the correctness of the finding on the law
and must affirm if there be any evidence in support thereof."
If, on the other hand, it be that, although the plaintiffs had
requested a peremptory instruction, the right to go to the jury
was not waived in view of the other requested instructions,
then our inquiry has a wider scope, that is, extends to deter-
mining whether the special instructions asked were rightly
refused, either because of their inherent unsoundness or because,
in any event, the evidence was not such as would have justified
the court in submitting the case to the jury. It was settled in
*Beuttell* v. *Magone, supra,* that where both parties request a
peremptory instruction and do nothing more, they thereby
assume the facts to be undisputed and in effect submit to the
trial judge the determination of the inferences proper to be
drawn from them. But nothing in that ruling sustains the view
that a party may not request a peremptory instruction, and yet,
upon the refusal of the court to give it, insist, by appropriate
requests, upon the submission of the case to the jury, where the
evidence is conflicting or the inferences to be drawn from the
testimony are divergent. To hold the contrary would unduly
extend the doctrine of *Beuttell* v. *Magone,* by causing it to
embrace a case not within the ruling in that case made. The
distinction between a case like the one before us and that which
was under consideration in *Beuttell* v. *Magone* has been pointed
out in several recent decisions of Circuit Courts of Appeals. It
was accurately noted in an opinion delivered by Circuit Judge
Severens, speaking for the Circuit Court of Appeals for the Sixth
Circuit, in *Minahan* v. *Grand Trunk Ry. Co.,* 138 Fed. Rep. 37,
41, and was also lucidly stated in the concurring opinion of

Shelby, Circuit Judge, in *McCormack* v. *National City Bank of Waco*, 142 Fed. Rep. 132, where, referring to *Beuttell* v. *Magone*, he said (p. 133):

"A party may believe that a certain fact which is proved without conflict or dispute entitles him to a verdict. But there may be evidence of other, but controverted facts, which, if proved to the satisfaction of the jury, entitles him to a verdict, regardless of the evidence on which he relies in the first place. It cannot be that the practice would not permit him to ask for peremptory instructions, and, if the court refuses, to then ask for instructions submitting the other question to the jury. And if he has the right to do this, no request for instructions that his opponent may ask can deprive him of the right. There is nothing in *Beuttell* v. *Magone, supra*, that conflicts with this view when the announcement of the court is applied to the facts of the case as stated in the opinion.

"In New York there are many cases showing conformity to the practice announced in *Beuttell* v. *Magone*, but they clearly recognize the right of a party who has asked for peremptory instructions to go to the jury on controverted questions of fact if he asks the court to submit such questions to the jury. *Kirtz* v. *Peck*, 113 N. Y. 226; *S. C.*, 21 N. E. 130; *Sutter* v. *Vanderveer*, 122 N. Y. 652; *S. C.*, 25 N. E. 907.

"The fact that each party asks for a peremptory instruction to find in his favor does not submit the issues of fact to the court so as to deprive the party of the right to ask other instructions, and to except to the refusal to give them, nor does it deprive him of the right to have questions of fact submitted to the jury if issues are joined on which conflicting evidence has been offered. *Minahan* v. *G. T. W. Ry. Co.* (C. C. A.), 138 Fed. Rep. 37."

From this it follows that the action of the trial court in giving the peremptory instruction to return a verdict for the railway company cannot be sustained merely because of the request made by both parties for a peremptory instruction in view of the special requests asked on behalf of the plaintiffs. The

correctness, therefore, of the action of the court in giving the peremptory instruction depends, not upon the mere requests which were made on that subject, but upon whether the state of the proof was such as to have authorized the court, in the exercise of a sound discretion, to decline to submit the cause to the jury. That is to say, the validity of the peremptory instruction must depend upon whether the evidence was so undisputed or was of such a conclusive character as would have made it the duty of the court to set aside the verdicts if the cases had been given to the jury and verdicts returned in favor of the plaintiff. *McGuire* v. *Blount*, 199 U. S. 142, 148, and cases cited; *Marande* v. *Texas & P. R. Co.*, 184 U. S. 191, and cases cited; *Southern Pacific Co.* v. *Pool*, 160 U. S. 440, and cases cited.

To dispose of this question requires us to consider somewhat in detail the origin of the controversy, the contracts of shipment from which the controversy arose and the proof which is embodied in the bill of exceptions relied on to justify the inference of liability on the part of the railway company.

The action brought by the Minnesota and Dakota Cattle Company concerned 1,635 head of cattle, shipped from Kenna, in the Territory of New Mexico, and 659 head, shipped from Bovina, Texas, both in the latter part of May, 1903, to Evarts, South Dakota, over the line of the Pecos Valley and Northeastern Railway Company, to be transported by that company "and connecting carriers." The other action concerned 798 head of cattle, shipped about the same time, at Hereford, Texas, by the Pecos and Northern Texas Railway Company, "and connecting carriers," to the same place in South Dakota.

There were written contracts of shipment, which it was declared embodied the entire agreement of the parties, and which contained stipulations restricting the liability of each carrier to his own line. In none of the contracts was there a specification as to the several lines of railroad over which the cattle should be transported. The station agent of the initial carrier, however, delivered way bills to the train conductors, routing the

cattle by the Atchison, Topeka and Santa Fé Railway to Atchison, thence by the Burlington Railroad from Atchison to Council Bluffs, and thence by the Milwaukee road from Council Bluffs to destination in South Dakota. Such station agent also made a memorandum on the back of some of the contracts, "Hereford to Atchison;" on others the endorsement was "Kenna, N. M., to Evarts, S. D.;" on others the endorsement was "Kenna, N. M., to Atchison, Kan.;" on others the endorsement was "Bovina, Tex., to Atchison, Kan." It was stipulated that the stock was not to be transported in any specified time nor delivered at destination at any particular date, nor in season for any particular market. The shipper also expressly assumed the risk of and released the company from any loss which might be sustained by reason of any delay in the transportation of the stock or injury thereto caused by damage to tracks or yards from storms and washouts. There was also an express agreement on the part of the shipper to care for the stock at feeding points. The company on its part agreed as follows:

"The company agrees to stop cars at any of its stations for watering and feeding, where it has facilities for so doing, whenever requested to do so in writing by the owner or attendant in charge, and the party of the second part agrees not to confine his stock for longer period than twenty-eight consecutive hours without unloading the same for rest, feeding and water for a period of at least five consecutive hours, provided he is not prevented from doing so by storm or other accidental causes."

The Pecos Valley and Northeastern Railway was the more southerly of the initial carriers. It connected at its northern terminus with the Pecos and Northern Texas road, and this latter road connected with the Atchison, Topeka and Santa Fé. This latter road, from its point of connection with the Pecos and Northern Texas Railway Company (at Amarillo or Higgins, Texas), extends in a generally northeasterly direction through Oklahoma and Kansas. The main line extends by way of Topeka to Kansas City, but at Emporia, south of To-

peka, there is a branch line or cut-off extending towards Kansas City, and which joins the main line running from Topeka to Kansas City at a place called Holliday, thirteen miles west of Kansas City. From Topeka, where the main line veers eastwardly to Kansas City, there is a branch line running to Atchison, which is about fifty miles north or northwest of Kansas City, on the Missouri River. At Kansas City both the Burlington and the Missouri Pacific systems connect with the Atchison, the two roads named operating lines which run in a northwesterly direction, on opposite banks of the Missouri River, to Council Bluffs and Omaha, respectively, and the two roads in question also connect at Atchison with the Achison road, which reaches that point by the branch from Topeka. The Missouri Pacific and Burlington systems connect, respectively, at Omaha and Council Bluffs with the Chicago, Milwaukee and St. Paul Railway, and the latter road extends to Evarts, South Dakota.

The Atchison company had feeding yards at Wellington and Strong City, these places being on the line of its road and situated to the south of Emporia. The road also had feeding yards at Emporia. There was no yard for such purposes, however, between Emporia and Atchison, or at Atchison itself, nor did the Burlington road have feeding yards at Atchison. The proof also was that to unload and reload an ordinary trainload of cattle required from four to five hours. There were in 1903, when the shipments in question were made, as there are at the present time, large public stock yards at Kansas City, where stock in transit could be unloaded for feeding and rest, and to enable it to be transferred from one road to another.

The cattle in controversy were conveyed from the starting points in four trains, and the order in which they arrived at feeding stations was as follows: Empire Company train (21 cars), arrived at Strong City (north of and run of five hours from Wellington) on Wednesday, May 27, 1903, 12:10 A. M.; First Minnesota Company train (20 cars), arrived at Wellington on Tuesday, May 26, 1903, between 10 and 11 P. M.; Second Minnesota Company train (19 cars), arrived at Wellington on Wed-

nesday, May 27, 1903, 5:30 P. M.; Third Minnesota Company train (20 cars), arrived at Wellington on Wednesday, May 27, 1903, between 6 and 7 P. M.

About six or seven hours before the arrival at Strong City of the train containing the Empire company cattle, above referred to, a shipment of cattle made by the same company to the same destination, but which is not here involved, had reached Strong City, and had been there unloaded for feeding and rest. Early on the next morning (Wednesday, May 27), the reloading of these cattle was commenced, but was stopped because of a notice to the Atchison of a washout on the Burlington road, north of Atchison. Notice, however, having been received by the Atchison from the Burlington on the afternoon of the same day that the washout had been repaired, the cattle were again reloaded and the train left Strong City at about 8:30 o'clock that night (Wednesday, May 27). In ordinary course the train would have been delivered to the Burlington at Atchison at about daylight the next (Thursday) morning, but about one o'clock on that morning the Burlington sent the following message to the Atchison company: "We cannot now accept Evarts stock. Our line washed out again. Will inform you when we can transmit stock." The chief clerk of the general superintendent of the Atchison, in communicating this message to him, also informed him that the track at Valley Falls, a station on the Atchison road between Topeka and Atchison, was in very bad condition, and that there was "no certainty as to how long it will be passable." We shall trace the further movement of this train hereafter.

Promptly after its arrival at Wellington the cattle in the first train of the Minnesota company were unloaded for food and rest. They were reloaded at about five o'clock on Wednesday morning, May 27. When information as to the washout on the Burlington came early on that morning the cattle were again unloaded, but when the notification was received that the tracks of the Burlington had been repaired the cattle were a second time reloaded, and the train left Wellington that even-

ing at about eight o'clock for Atchison. When the train was a few miles east of Strong City, very early on Thursday morning, it was ordered to return as far as Strong City and there unload. This order was given in consequence of the second message from the Burlington road above referred to. From this situation it resulted that all the cattle in controversy were in the yards of the Atchison at Wellington or Strong City, that road being uncertain as to the condition of its own tracks on the branch road from Topeka to Atchison, and knowing to a certainty that the Burlington had declined to receive the cattle at Atchison, on account of the condition of its tracks. Under these circumstances, promptly, on Thursday morning, negotiations were commenced by the Atchison with the Missouri Pacific road and by noon that road had agreed to receive the cattle at Kansas City, and soon afterward instructions were given to load the stock then at Wellington and Strong City, preparatory to being forwarded to Kansas City.

The first Empire company train, which was on its way to Atchison when the information of the break came, on Thursday morning, and whose movements we have said we would hereafter trace, along with a train of twenty-two cars which had preceded it with cattle destined to Sioux City, were ordered to proceed to Kansas City, and did so. One of the Minnesota company trains, of nineteen cars, at the Wellington yards was also directed to depart for Kansas City on Thursday. Before, however, it was practicable to move the other cattle trains which remained at Wellington and Strong City, uncertainty arose as to the ability of the Missouri Pacific to take the cattle forward from Kansas City, caused by a telegram on that subject, received from the general superintendent of the Missouri Pacific road. By about nine o'clock on that (Thursday) evening, however, this uncertainty was dispelled, and about the same time the Atchison company was notified by the Burlington that it also was in condition to receive and forward cattle at Kansas City. On the next (Friday) morning the first Minnesota company train of twenty cars, which was at Strong City,

to which point it had been turned back on the advice of the washout on the Burlington road, and the Empire train of twenty-one cars originally unloaded at Strong City were reloaded, and the two trains were consolidated into one and started about noon on Friday for Kansas City. So, also, the third Minnesota company train of twenty cars, which had been held at Wellington waiting for an opportunity to send it forward, left there early Friday morning.

The three trainloads of cattle previously referred to, which had been ordered to Kansas City and started for that point during Thursday before the uncertainty arose as to the ability of the Missouri Pacific to receive and forward the cattle from Kansas City, reached that place as follows: forty-two cars, consisting of the Sioux City and first Empire train, arrived on the morning of Friday, and were delivered to the Burlington and went forward. The nineteen cars belonging to the Minnesota company, which had left Wellington also on Thursday, arrived about three o'clock on the afternoon of Friday, and because of the length of the journey from Wellington did not go forward, but were unloaded at the stock yards for food and rest. The trains which did not get away from Wellington and Strong City on Thursday before the uncertainty arose, but which left those places on Friday after the uncertainty had been dispelled, reached Kansas City early on Saturday morning. The first of these latter trainloads, the twenty cars from Wellington, arrived at about six o'clock, and the cars were placed on the transfer track of the Missouri Pacific at the stock yards and were taken in charge by the switching crew of that company and were unloaded at its chutes at the stock yards. The second—that is, the consolidated train from Strong City—arrived an hour or two afterwards, and was unloaded at the stock yards, the delivery there being claimed to be a delivery to the Missouri Pacific Company.

In the early part of the forenoon of Saturday some of the local officers of the Missouri Pacific, asserting that they had not been notified by the general officers of that road of an arrangement

to take the cattle, hesitated to do so. By noon, however, the doubt was dispelled, since the local officers of the Missouri Pacific applied to the Atchison for cars to move the cattle. Steps were taken by the Atchison to at once furnish the cars, but before midday the Atchison company was notified that the cars would not be required, as the Missouri Pacific would, be unable, because of the condition of its tracks, to move the cattle forward on that day.

Prior to the shipments of the cattle in question and at the time of the movement of the trains to which we have referred, there had been copious rainfalls in the valley of the Kaw, or Kansas, River, a tributary of the Missouri River, emptying into the same at Kansas City, and the interruptions and wash-outs, to which we have referred, were the results of flood conditions created by such rains. The Kansas, or Kaw, River and the Missouri River north of Kansas City, and the Kaw River, especially at Kansas City, were undoubtedly in a more or less accentuated flood condition. On Saturday morning the stage of the Kansas River at Kansas City was slightly below, and certainly was not higher, than that of the previous highest flood recorded at that point, viz., the flood of 1881. The stage of the 1881 rise, however, was not considered dangerous in the yards in 1903, as in the prior flood the water only came upon a small portion of the yard and afterwards the yards were filled and graded, so that in 1903 a rise equalling that of 1881 would not have come into any of the pens. The reports on Saturday from the weather observer at Topeka, Kansas City, and from other sources, were not alarming. Between the time, on Saturday morning, when the cattle were put in the stock yards, and Sunday morning the river rose four feet. Indeed, on Sunday morning, the water was one to four feet deep over one-half to three-fourths of the yard. On that morning all the live stock were put on the viaducts, which were about ten feet above the level of the yards. During daylight Sunday the water rose another four feet, and during Sunday night and Monday morning five feet more, and when the rise ceased on June 1 the river

was thirteen and one-half feet above the high-water mark of 1881.

The stock yards were entirely submerged, and the entire bottoms, east and west of the river, clear to the bluffs, were flooded—the water in that territory being from five and six to fourteen feet deep. Situated within this district was the live stock exchange building, containing a bank and numerous offices, including those used by the live stock officials of the different roads. There was also within the flood area a number of other banks, numerous hotels, stores and lumber yards; all the packing houses of Kansas City, railroad shops and yards, and the union depot; nearly all the large factories, warehouses, implement houses and wholesale grocery stores. So unexpected to all concerned was the rise of the river that not a dollar's worth of property was removed in anticipation of the flood. Many thousands of homes in Kansas City were submerged, and the inhabitants fled to the hills and other places of safety, with nothing saved from destruction but the clothing they had on. An illustration of the suddenness of the disaster is afforded by the following: During the morning of Sunday the finest passenger train of the Atchison road, its California limited from Chicago, arrived at the union depot with passengers. The engine was uncoupled from the train and moved to the coal chute, and after coaling, on account of the rapid rise of the water and floating driftwood, was unable to get back to the depot. When the flood came on Sunday morning, May 31, it swept fifteen or sixteen bridges from their piers, about two thousand houses from their foundations, hundreds of freight cars from the tracks, and every lumber yard in the bottom lands, and the lumber was swept away. Houses, lumber, cars and other wreckage were piled in the streets, completely blocking them, and drifted upon the wrecked bridges. The one bridge which stood was the Missouri Pacific bridge, upon which for safety there had been stationed seventeen locomotives. The debris carried against that bridge completely damned the river, so that the water ran over the top of the locomotives on the bridge.

The vast accumulation of debris in the streets and against the bridges obstructed the flow of the water, so that the river rose higher than it otherwise would have done, it being ten feet and five inches higher at the mouth of Turkey Creek, near the stock yards, than it was at Hannibal bridge over the Missouri River, at about a mile below.

For a period of seven or eight days, whilst these appalling conditions continued, the cattle remained upon the viaducts, as we have said, could not be properly fed and watered, and over five hundred perished, and the remainder were greatly injured. After the subsidence of the flood, owing to the fact that the cattle were in such a starved and weakened condition as to be unfit to be carried forward to the point of destination, the railway company, seeking to minimize the loss, and with the consent of the plaintiffs, and after they had refused to receive the cattle, carried the remainder of the herd to pastures in Lyon County, Kansas, where they were held until about the tenth of July following, when they were forwarded by the railway company on the original billing to Atchison, Kansas, and from thence to the place of destination over the Burlington and St. Paul roads.

With these undisputed facts in mind let us briefly consider the contentions relied upon to establish the liability of the railway company, in order to determine whether there was any evidence of negligence adequate to have justified the submission of the case to the jury.

1. It is urged that the company was negligent in detaining the cattle at Wellington and Strong City, and in not carrying them promptly by way of Topeka to Atchison and there delivering them to the Burlington. The undisputed facts which we have stated concerning the prompt arrival of the cattle at Wellington and Strong City, the early initiation of their movement forward as routed, the information as to the washouts on the Burlington line and of the bad condition of the track of the Atchison company, the unloading and reloading, and the final impossibility of sending the cattle forward by way of

Topeka to Atchison, we think completely answers the proposition, and leaves room for no other conclusion than that it would have been the duty of the court to set aside any verdict which had been rendered upon the contrary hypothesis.

2. It is insisted that, even if there was no proof of negligence on the part of the company because of its failure to move the cattle by way of Topeka to Atchison, they should have been detained at the Strong City and Wellington feeding stations "until the flood, which had been on in the Kaw River, had subsided." And, although argued as a separate proposition, involved in and connected with the contention just stated, it is urged that the railway company was negligent in deviating the shipments to Kansas City, thereby taking the cattle into the lowlands at the mouth of the river in front of the approaching flood. But we think these contentions are disposed of by the statement of the undisputed facts which we have heretofore made. Whether, irrespective of negligence, the railway company, as a matter of law, was without the lawful power when the break in the lines occurred to seek to discharge its duty to forward promptly, by sending the cattle via Kansas City, is a subject which we shall hereafter separately consider. The propositions we are now considering are, therefore, to be tested solely by considering whether there was any proof tending to show negligence in sending the cattle via Kansas City. That the stock yards at Kansas City under ordinary conditions were a fit connecting point to send the cattle, in view of the break in the line of connection to Atchison via Topeka, cannot be disputed. The propositions therefore reduce themselves to the contention that the flood conditions were such that it was negligence on the part of the carrier to send the cattle to Kansas City, because the railroad officials knew, or should have known, that it would be unsafe to send them to that point. We are of opinion, however, that the undisputed facts which we have recited, concerning the eligibility and safety of the stock yards at Kansas City under normal conditions, and the unexpected and unprecedented character of the flood which subsequently

engulfed those parts, entirely dispose of the contention. But the want of merit in the proposition does not alone depend upon these general considerations, as we think that the record abundantly shows that there was no reasonable ground whatever for the contention that the officers of the Atchison company were in any way lacking in diligence in endeavoring to ascertain the flood conditions and the probability as to a further rise in the river, which might render it hazardous to take the cattle to Kansas City. This is also indisputably shown by the negotiations with the Burlington and Missouri Pacific roads in respect to receiving the cattle at Kansas City as it is manifest that those officials, like all others concerned in the vast interests which were destroyed by the flood in question, had not the slightest suspicion, or reason to indulge in the suspicion, that a flood of such unprecedented and injurious proportions would come upon Kansas City. These considerations and those which we have previously stated effectually also dispose of the last contention as to acts of alleged negligence on the part of the railway company, viz., that the railway company was negligent in failing to move or cause to be moved the cattle from their position of peril in the stock yards at Kansas City before the arrival of the climax of the flood.

It remains only to consider the proposition that, irrespective of the absence of all negligence, the railway company was as a matter of law responsible, because of an alleged wrongful deviation, caused by carrying the cattle via Kansas City instead of via Topeka to Atchison, for delivery there to the Burlington road. No express agreement was shown to carry the cattle to Atchison via Topeka. But as that route was the usual and most direct one for such shipments, and as the owners were to be subjected to the expense of feeding en route, we shall assume, for the sake of argument, the best possible view for the plaintiffs, viz., that the duty of the railway company, under normal conditions, was to transport the cattle by that route. But this general duty, assumed though it be, was in the very nature of things restrained and limited by the right

of the carrier, in case of necessity, especially in order that it might carry on the operations of its road, to resort to such other reasonably direct route as was available under existing conditions to carry freight of this character to destination. By the admiralty law, a departure from the regular course of a shipment when done under the usage of trade is no deviation. *Hostetter* v. *Park*, 137 U. S. 31, 40. So, also, in *Constable* v. *National S. S. Co.*, 154 U. S. 52, it was said: "In the law maritime a deviation is defined as a 'voluntary departure without necessity or any reasonable cause, from the regular and usual course of the ship insured.'" As we think the undisputed proof to which we have referred not only established the existence of the necessity for the change of route, but also, beyond dispute, demonstrated that there was an entire absence of all negligence in selecting that route, we are clearly of opinion that no liability was entailed simply by reason of the change, even if that change could in law be treated as a concurring and proximate cause of the damages which subsequently resulted.

*Affirmed.*