### BURWELL et al. v. AMERICAN COKE & CHEMICAL CO.

(Circuit Court of Appeals, First Circuit. July 7, 1925.)

No. 1720.

1. **Contracts ⬤⇒28(3) — Negotiations held not to have resulted in binding contract.**

Negotiations between plaintiffs and representatives of defendant corporation *held*, on the evidence, not to have resulted in a contract binding on defendant, but to have been preliminary only to the making of a written contract with the approval of defendant's executive committee, in case its terms were finally and definitely agreed on.

2. **Frauds, statute of ⬤⇒95(1)—Advances held not payments made on contract.**

Advances made by defendant to plaintiffs during negotiations for a contract between them *held* not to have been intended or received as payments under the contract, such as would take it out of the statute of frauds, but to be considered as loans to maintain the status quo pending the negotiations, and to be repaid if the contract should not be finally concluded.

3. **Frauds, statute of ⬤⇒95(1)—Payments, to take contract out of statute, must be obligatory thereunder.**

Payments, which take a contract out of the statute of frauds, must be made on the contract, or in part payment of the consideration expressed therein.

4. **Frauds, statute of ⬤⇒82—Contract for sale of corporate stock is within statute.**

A contract for sale of stock in a corporation is within the statute, and is not taken out

of the statute by the fact that the stock is to be paid for in stock of another corporation, to be thereafter organized.

In Error to the District Court of the United States for the District of Maine; John A. Peters, Judge.

Action at law by Arthur W. Burwell and others against the American Coke & Chemical Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

Samuel Doerfler, of Cleveland, Ohio, and Leon V. Walker, of Portland, Me. (Verrill, Hale, Booth & Ives, of Portland, Me., on the brief), for plaintiffs in error.

Peter B. Nelson, of Defrees, Buckingham & Eaton, of Chicago, Ill. (Leonard A. Pierce, of Cook, Hutchinson & Pierce, of Portland, Me., on the brief), for defendant in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

JOHNSON, Circuit Judge. In this case the presiding judge directed a verdict for the defendant at the close of all the evidence, which is assigned as error.

The plaintiffs, five in number, organized in 1917 the Western Reserve Chemical Company for the purpose of manufacturing chemicals by a secret process devised by one of them, Arthur W. Burwell. In this process the electrolytic method was used, by which acids once used for oxidizing purposes could be used several times.

This corporation began operations in Cleveland, Ohio, and by the beginning of 1919 had expended over $300,000 in making this secret process efficient upon a factory scale. While it had sold its manufactured products to the amount of $80,000, it then had a deficit of about $13,000, and had incurred an indebtedness of $97,000 to a bank in Cleveland, about $26,000 in current obligations, and $30,000 to its stockholders, who had advanced that amount of money to keep it going.

The defendant is a Maine corporation. Its principal asset was the ownership of certain patents on what was known as the Roberts coke ovens and Roberts' process of producing coke from low volatile coals. It owned no plant, but had licensed the St. Louis Coke & Chemical Company under its patents. This latter company was erecting a coke plant at Granite City, Ill.

The American Coke & Chemical Company conceived the idea of organizing a holding company to take over several companies interested directly in the manufacture of dyes and the utilization of the by-products of coke manufacturing. Among the companies called to its attention was the Western Reserve Chemical Company. Negotiations in behalf of the plaintiffs were carried on entirely by Kornhauser and Burwell. Roberts was chairman of the executive committee of the defendant company, and had an interview with Kornhauser and Burwell about the 1st of November, 1919, and after this they furnished him with a report. This report, with those relating to other similar companies, was submitted to the executive committee of the defendant company, which, at a meeting held December 6, 1919, considered the same, and the following action was taken, as appears from the minutes of that meeting:

"After a full discussion of the matter it was considered advisable to make a careful examination and verification of the reports already obtained as outlined in the plan presented by the chairman involving an audit and an examination of the dye plants concerned. The investigation along those lines was therefore authorized, with the suggestion that an audit and appraisal and an investigation from a chemical standpoint be made of the various dye plants designated, to the executive committee, and that the services of Alexander H. Twombly, and such other engineer familiar with the dye industry as may be desirable, be used in this connection."

There was no inspection of the plaintiffs' plants by any one authorized by the defendant until February 18 or 19, 1920. A report of this was made to Roberts.

It is claimed by the plaintiffs that the defendant at Cleveland, in the state of Ohio, on May 7, 1920, entered into a contract with them, by which it agreed to purchase all the outstanding shares of the capital stock of the Western Reserve Chemical Company held by the plaintiffs, to cause a corporation to be organized with a capital stock of $10,000,000 preferred stock and $1,000,000 common stock, to issue or cause to be issued to the plaintiffs 2,000 shares of said preferred stock of the par value of $200,000 and 500 shares of common stock of the par value of $2,500, to pay or cause to be paid to the plaintiffs the sum of $97,000 to be used by them in obtaining their release from their liability as indorsers upon certain promissory notes of the Western Reserve Chemical Company held by the Union Commerce National Bank of Cleveland, or that, in lieu of

payment of the said sum of $97,000, to obtain the release of the plaintiffs, or of such of them as were indorsers upon said notes, from further liability as such indorsers, to pay the current indebtedness of the Western Reserve Chemical Company amounting to approximately $26,000, and also to advance moneys to pay the current operating expenses of said Western Reserve Chemical Company and to expand its manufacturing equipment and enlarge its scope of operations; and they, the plaintiffs, agreed to surrender and discharge their claims, amounting to $30,000, for money advanced by them to the Western Reserve Chemical Company. The defendant denies that such a contract was made, and says that negotiations were begun looking to the making of a contract, but that no completed contract covering all the matters which had been the subject of these negotiations was ever entered into and completed, and that it was the understanding of both parties to the negotiations that a written contract embodying all of the matters which had been discussed and under consideration would be authorized to be executed in its behalf by a vote of its directors or executive committee.

In its answer it also sets up the statute of frauds.

The learned judge of the District Court found that the negotiations between the parties had never resulted in any contract such as claimed by the plaintiffs; that all of the evidence was "consistent with the idea of negotiations, and not at all consistent with a final agreement," and stated:

"I can find no evidence here that can satisfy a reasonable and unprejudiced mind that the parties ever concluded an agreement, nor is there sufficient evidence that the corporation was bound by what was claimed to have been done."

He also found that the statute of frauds would bar recovery and directed a verdict for the defendant.

The law governing the direction of a verdict is clearly stated in Slocum v. New York Life Ins. Co., 228 U. S. 364, 33 S. Ct. 523, 57 L. Ed. 879, Ann. Cas. 1914D, 1029, where the court said at page 369 (33 S. Ct. 525):

"As a preliminary to the consideration of the first question it may be well to repeat, what this court often has said, that when, on the trial of the issues of fact in an action at law before a federal court and a jury, the evidence, with all the inferences that justifiably can be drawn from it, does not constitute a sufficient basis for a verdict for

the plaintiff or the defendant, as the case may be, so that such a verdict, if returned, would have to be set aside, the court may and should direct a verdict for the other party."

See Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 S. Ct. 275, 45 L. Ed. 361, and cases cited; also compare Empire State Cattle Co. v. Atkinson Ry. Co., 210 U. S. 1, 28 S. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70, and cases cited.

The record is a long one, and gives the history of negotiations between the parties over a long period of time, beginning in November, 1919, and continuing down to the early part of the summer of 1920.

[1] After a careful examination a majority of the court have reached the same conclusion as did the judge of the District Court. The negotiations were largely conducted by Kornhauser and Burwell, representing the plaintiffs, and Roberts, chairman of the executive committee of the defendant company. Kornhauser was the principal witness for the plaintiff, and, placing the interpretation most favorable to the plaintiffs upon his testimony, with all the reasonable inferences that can be drawn therefrom, we think no other conclusion can be reached than that the parties contemplated that the result of their negotiations should be embodied in a written contract, which should be submitted to the executive committee of the defendant and authorized by it.

Conceding that there was evidence from which the jury could find that Roberts had authority to enter into negotiations with the plaintiffs, there was no evidence that he had authority to enter into any contract binding upon the defendant, and we think the evidence and the circumstances under which the negotiations were conducted conclusively show that the parties understood that the result of these negotiations was to be submitted to the executive committee of the defendant and acted upon by it. This appears, not only from the vote that was passed by it, but also from what was said and done by those conducting the negotiations.

The plaintiffs claim that at a meeting in New York on April 12, 1920, at which Roberts, Burwell, and Kornhauser were present, Roberts explained the organization of a dye company which was to take over several plants, including that of the Western Reserve Company, and that he then agreed to an exchange of the stock of the new company for the stock held by the plaintiffs upon the basis of $100 of the preferred

stock and one-quarter share of the common stock of the company to be formed for every $100 in net value of the assets of the Western Reserve Company, and also agreed to assume the indebtedness of the Western Reserve Company, with the exception of the $30,000 owed by it to the plaintiffs, which they were to surrender; also to employ Dr. Burwell as a chemist of the new company, and that both Kornhauser and Burwell should be directors of the new company; that there was also discussion in regard to taking care of the loan of the Union Commerce Bank of Cleveland, by putting up preferred stock of the new company as collateral and releasing collateral already held by the bank; that Roberts prepared a memorandum, not as evidence of any agreement, but to show the contemplated organization, to be submitted to the bank. While Kornhauser testified that the substantial elements of the contract were agreed upon at this meeting, it is evident that he understood that action by both corporations was necessary to conclude the contract, for, under date of April 17, 1920, Kornhauser wrote to Roberts, stating that necessary action had been taken by his company "to an exchange on the basis we discussed," that he regretted that he could not send an equally satisfactory reply on the part of the Union Commerce National Bank, and expressing the "hope that nothing would occur to jeopardize the transaction when it has been brought so close to fruition."

On May 3, 1920, the parties met again in Chicago at the request of Roberts. Kornhauser and Burwell there met Roberts and Barclay, who was comptroller and auditor of the defendant company, and Harper, who was its assistant secretary. The meeting took place in the office of the American Coke & Chemical Company. A patent attorney was also present; but Kornhauser testified that they refused at that time to give out any of the matters relating to the secrets involved in the process "until the last detail of our agreement with the American Coke & Chemical Company is settled, and we have not yet settled the valuation of the plant"; that Roberts agreed to this; that Barclay and Harper were then called by Roberts, who said, "You may now sit down and figure out the valuation of this plant;" that Barclay and Harper, Dr. Burwell, and Kornhauser arrived at a valuation of the plant of the Western Reserve Chemical Company and its liabilities; that Roberts expressed surprise that the current ob-

ligations were $26,000; and that, as a result of the interview, the sum of $200,000 was arrived at as the net valuation of the plant, for which the plaintiffs were to receive an equal sum in the preferred stock of the new company which was to be formed, and also a certain amount of its common stock.

Kornhauser further testified that it was then agreed that Twombly should come down to Cleveland and make a survey of the plants of the Western Reserve Chemical Company.

In regard to the visit of Twombly to Cleveland, Roberts wrote Kornhauser under date of May 5, 1920:

"We are asking Mr. Twombly to make a careful examination of the entire situation, and from an engineering and an operating point of view, covering the processes, the present equipment, the products, costs of materials, processing, and other items, the markets, and to make his recommendation for expansion, with full details and information covering the costs, expenditures, and the probable income resulting from such expansion.

"You will see that the work which we are asking Mr. Twombly to do covers, not only getting our feet on the ground with respect to the actual condition of affairs, but also working out the basis for the necessary expansion immediately in view.

"Mr. Harper mentioned to me the matter of the final determination of the basis for taking over the Western Reserve Chemical Company, including the suggestion made by Mr. Burwell that the figure of preferred stock carrying its quarter share of common, which will be available net after deducting the liabilities, be $200,000, or a modification of the total figure from $342,000 of preferred stock to $323,000.

"We are ready to agree to this modification, and you may therefore regard the basis of this transaction as so determined. We shall be glad to have a confirmatory letter from you concerning this latter matter and also concerning the arrangements we have made with Mr. Twombly."

Under date of May 7, 1920, Kornhauser wrote Roberts in reply to the preceding letter:

"I have discussed with the other stockholders the proposed basis for the exchange under which there will be available, net, after deducting liabilities, $200,000 in preferred stock, carrying with it a quarter share of common stock for each share of preferred, and making the total figure of preferred

stock $323,000. I have their consent to this arrangement, and on our return to Chicago I shall be vested with authority to execute the instrument embodying the terms of our agreement which Mr. Harper is preparing."

It is upon the statements of Roberts on May 3d at Chicago, and what was said in his confirmatory letter of May 5th, that the plaintiffs ground their cause of action, and state that the contract was concluded. It is evident, however, that it was then understood by the parties that Harper was to put in writing the agreement which had been entered into, and, while Kornhauser testified that in the reference in his letter to this agreement, he referred only to an agreement to be drawn up by Harper, containing a guaranty on the part of the plaintiffs that the stockholders would release their claims against the Western Reserve Chemical Company, amounting to $30,000, and that the liabilities of the Western Reserve Company did not exceed $123,000, it is not reasonable to suppose that the agreement which Harper was to draw would contain this, and nothing else, omitting the important parts of the contract.

Twombly, the engineer, whose services the executive committee had voted to engage, did not make his report until May 18, 1920, nor was the report of the auditor, Barclay, made until May 13th. The only reasonable inference that can be drawn from the vote of the executive committee and the subsequent conduct of the parties is that no contract was concluded upon May 7th, and that it must have been in the contemplation of all the parties to the negotiations that these reports should be considered by the executive committee of the defendant company before any final action was taken.

June 1, 1920, Kornhauser did not consider that a contract had been concluded, for he wrote Barclay, the auditor:

"You may rest assured that I shall do everything in my power to keep things moving smoothly at this end, pending the time the final arrangements can be perfected."

The secret process which had been discovered by Dr. Burwell, Kornhauser testified, was the most valuable asset of the Western Reserve Chemical Company, and that its formula had been written out by Dr. Burwell and deposited with a trust company in Cleveland, and was the property of the Western Reserve Chemical Company. This was never delivered to the defendant, nor any agreement made as to its final delivery. While Kornhauser testified that this secret process was disclosed to Twombly, and that

he was a chemist, Twombly testified that, when he made his examination, Dr. Burwell disclosed the general process, but not its technique; that "the operation of the plant is very largely a personal equation, and his (Dr. Burwell's) intimate knowledge of the chemical relations is necessary in order to make the plant produce the proper results; that without such technical knowledge it would be almost impossible to operate the plant successfully, even having the apparatus in your possession;" that his report covered what was open to the eye to a great extent, but not the secrets of the process; that he was not chemist, and that he was unable to discover from the examination that he had made, or what was disclosed to him by Dr. Burwell, the secret of the process, or, as he expressed it, "its technique."

Without a disclosure of the secret process which Kornhauser regarded as the most valuable asset of the Western Reserve Company, and without which Twombly testified that it would be impossible to operate the plant of the Western Reserve Company successfully, no other conclusion can be reached than that a written contract in which the disclosure of this should be covered was within the contemplation of the parties.

In Mississippi & D. Steamship Co. v. Swift et al., 86 M. 248, 29 A. 1063, 41 Am. St. Rep. 545, the court, in a well-considered opinion, which has been frequently cited, said:

"If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.

"In determining which view is entertained in any particular case, several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations."

[2] While money was advanced by the defendant to meet the current obligations of the Western Reserve Chemical Company, it is obvious that these advances were made

simply for the purpose of keeping the Western Reserve Chemical Company alive until a contract was consummated. The money was advanced, not in the way of payment, but was furnished to Kornhauser as trustee under an agreement that he should hold the funds so paid to him, and disburse them for the liquidation of the liabilities of the Western Reserve Chemical Company, as directed by the American Coke & Chemical Company, and the Western Reserve Chemical Company agreed to repay and reimburse the American Coke & Chemical Company for money so advanced out of the proceeds from the sale of its products, upon which it should be a first charge.

Under this arrangement the defendant did advance the sum of about $13,000. The last payment of $4,750 was by check inclosed in a letter, in which also was inclosed the form of a contract under date of July 12, 1920, which had been prepared by Harper and forwarded to Kornhauser, and in which proposed contract it was provided that money should be advanced to cover current obligations of the company, and a statement in the letter in regard to the same is as follows:

"We are inclosing our check for $4,750, covering the first payment provided for in the contract, and we of course understand that, while we are not holding up this payment until the contract is signed, the payment is made subject to the signing of the contract."

The plaintiffs refused to sign the contract with which the check had been forwarded, but used the check.

It is claimed by the plaintiffs that these payments were made in accordance with the contract entered into between the parties and therefore would take the same out of the statute of frauds. It is apparent, however, that these advances, except the last, were not made as payments on account of the contract, but as loans to the Western Reserve Chemical Company to tide it over its financial difficulties, as stated in the letters accompanying them; that they were to be repaid by that company out of the proceeds of its sales and to be a first lien upon the same; and that the last was made conditional upon the execution of the contract which accompanied it.

[3] It is elementary that payments which take a contract out of the statute of frauds must be those made upon the contract, or in part payment of the consideration expressed therein. The express stipulation under which money was remitted to Kornhauser as trustee negatives the claim that it was paid to discharge any obligation under a binding contract.

[4] Ever since the decision rendered in Tisdale v. Harris, 20 Pick. (37 Mass.) 9, it has been held by the great weight of authority in the state and federal courts that a contract for the sale of stock in a corporation is within the statute of frauds. Koewing v. Wilder, 128 F. 558, 63 C. C. A. 186; Franklin v. Matoa Gold Mining Co., 158 F. 941, 86 C. C. A. 145, 16 L. R. A. (N. S.) 831, 14 Ann. Cas. 302; Snow Storm Mining Co. v. Johnson, 186 F. 745, 108 C. C. A. 615; Hinchman v. Lincoln, 124 U. S. 38, 8 S. Ct. 369, 31 L. Ed. 337. See also Cook on Corporations (7th Ed.) vol. 2, § 339, and cases cited; Spencer v. McGuffin, 190 Ind. 308, 130 N. E. 407, 14 A. L. R. 386, 391.

As the statute in both Ohio and Illinois expressly includes contracts for the sale of choses in action, it is clear that it would cover a sale of corporate stock.

The contention of the plaintiffs that the contract under which they seek to recover is not within the statute, because it is one for the sale of stock in a corporation which had not been organized, cannot be sustained.

In their declaration they claim to recover for a breach of a contract to purchase their stock in the Western Reserve Chemical Company. That they also allege in their declaration that this stock was to be paid for in stock to be issued by a company not then organized does not make the contract which they have set up any less a contract for the sale of their stock.

Whether the alleged contract of the defendant corporation to cause a corporation not then organized to issue its stock was unauthorized and beyond the powers of the defendant has been briefly argued by counsel upon one side only, and we pass this question. Our conclusion is that, if a verdict had been rendered for the plaintiff, it would have been the duty of the District Court to set it aside, and that there was no error in ordering a verdict for the defendant.

The judgment of the District Court is affirmed, with costs to the defendant in error in this court.

ANDERSON, Circuit Judge, is of the opinion that it was for the jury to say whether the minds of the parties had actually met on all the essentials of the proposed contract, and also whether the advances made were not, under all the conditions, part payment, thus taking the case out of the statute of frauds.