## CITIZENS' NAT. BANK OF BROWNWOOD v. TEXAS COMPRESS CO. (No. 7071.)[*]

Court of Civil Appeals of Texas. Austin.
April 13, 1927.

Rehearing Denied May 4, 1927.

1. **Trial** &#8596;177—Requests by both parties for peremptory instructions held not to waive either's right to have all issues of fact submitted to jury (Rev. St. 1925, arts. 2184–2186, 2189, 2190).

Action of both parties in requesting peremptory instructions *held* not to involve submission of issues of fact to court or waive right to jury trial in case motion should be denied under Rev. St. 1925, arts. 2184–2186, 2189, 2190; party requesting peremptory instruction being in same position after refusal as if no motion had been made.

2. **Appeal and error** &#8596;212—Action of court in giving peremptory instruction can be attacked on appeal, though no objection was taken (Rev. St. 1925, art. 2185).

Rev. St. 1925, art. 2185, requiring that objections be made to court's charge in order to preserve question on appeal, *held* not to apply to peremptory instruction; giving of such instruction not being charge, but ruling on effect of evidence.

3. **Trial** &#8596;176—Request for peremptory instruction is not express waiver of written charge permitting findings by court (Rev. St. 1925, art. 2184).

Motion for peremptory instruction does not constitute express waiver of written charge by court to jury on law of case either by general or special issues under Rev. St. 1925, art. 2184, permitting findings by court.

---

&#8596;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error pending.

**4. Trial ⟨⟩351(2)—Request for submission of special issues is not "waiver of jury trial" on unsubmitted issues raised by opponent's evidence (Rev. St. 1925, arts. 2184, 2185).**

Request to have case submitted on special issues is not waiver of jury trial on issues raised by opponent's evidence and not included in special issues requested under Rev. St. 1925, arts. 2184 and 2185, as party is under no duty to submit issues appertaining to other party's case.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Waiver of Jury Trial.]

**5. Trial ⟨⟩356(1)—In trial on special issues, every issue necessary to support judgment must be found affirmatively.**

In trial by jury on special issues, there must be an affirmative finding on every issue necessary to support judgment.

**6. Trial ⟨⟩351(2)—Judge's power to make findings where none are requested extends only to incidental findings necessary to support judgment in connection with jury's findings.**

Power of judge to make findings where none are submitted or requested extends only to incidental or subsidiary findings necessary to support judgment in connection with issues submitted to and found by jury.

**7. Trial ⟨⟩351(2)—Party who fails to submit issues on which he relies waives trial thereon.**

Party who seeks to have case submitted on special issues waives trial on issues appertaining to his own case which he fails to submit.

**8. Trial ⟨⟩351(2) — Issue not requested is treated as abandoned and goes out of case.**

In trial by jury on special issues, where no request for submission of issue is made, such issue is treated as abandoned and goes out of case.

**9. Estoppel ⟨⟩52—Waiver is not imputed, unless duty is imposed.**

Where no duty is imposed, no waiver can be imposed.

**10. Trial ⟨⟩351(2)—In conversion action for nondelivery, plaintiff's failure to request, among special issues submitted, issues raised by defense, did not empower court to make findings on such omitted issues.**

In action by bank, as owner of cotton, for conversion thereof by compress in failing to deliver it on demand, bank by requesting peremptory instruction and submitting special issues did not waive right to jury trial on defensive issues of agency and defendant's authorization to make delivery of cotton elsewhere, or give court authority to make findings on such omitted issues.

**11. Warehousemen ⟨⟩25(1)—Where owner's agent had no authority to deliver cotton on credit, delivery under agent's direction did not relieve compress from liability (Uniform Warehouse Receipt Law, § 9).**

In conversion action against warehouseman for failure to deliver cotton to owner, de-livery to person to whom cotton was sold or to be sold under claim that delivery was authorized by owner's agent *held* not delivery to person lawfully entitled thereto which would protect warehouseman under Uniform Warehouse Receipt Law, § 9 (Rev. St. 1925, art. 5620, subd. 1), where authority was not given owner's agent to deliver on credit.

**12. Warehousemen ⟨⟩25(1) — Compress instructed by owner's agent to clear cotton in buyer's name would not be liable to owner if agent was authorized (Uniform Warehouse Receipt Law, § 9).**

In conversion action by bank owning cotton against compress for failure to deliver, if bank's agent gave compress verbal instructions authorizing it to clear cotton in name of buyer, compress in acting on such instructions was not liable under Uniform Warehouse Receipt Law, § 9 (Rev. St. 1925, art. 5620, subd. 2), though instructions were oral only, provided agent was acting within scope of actual or apparent authority.

**13. Warehousemen ⟨⟩25(1) — Receipts given by compress reciting surrender of cotton tickets for compression and shipment of cotton held not "trust receipts."**

Receipts given by compress reciting cotton tickets were surrendered for purpose of having cotton compressed and shipped *held* not trust receipts, requiring compress to hold possession of cotton as trustee.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Trust Receipt.]

**14. Warehousemen ⟨⟩34(9) — Whether owner's agent gave compress authority to clear cotton in name of buyer held for jury (Uniform Warehouse Receipt Law, § 9).**

In action by bank against compress for conversion of cotton by premature delivery thereof to person to whom cotton was sold, issue whether compress was warranted in making delivery under Uniform Warehouse Receipt Law, § 9 (Rev. St. 1925, art. 5620, subd. 2), by authority or instructions given by bank's agent to clear cotton in buyer's name, *held* for jury.

**15. Banks and banking ⟨⟩228—Issue whether owner's agent had authority to instruct compress to clear cotton in buyer's name held for jury in conversion action.**

In action by bank owning cotton against compress for delivery prematurely to person to whom cotton was sold, issue whether bank's agent had authority to instruct clearance of cotton in buyer's name *held* for jury.

On Rehearing.

**16. Statutes ⟨⟩225¾—Re-enactment of statute without substantial change carries with it previous judicial construction.**

Re-enactment of statute without substantial change carries with it previous construction placed thereon by decisions of courts.

Appeal from District Court, Brown County; J. O. Woodward, Judge.

Action by the Citizens' National Bank of Brownwood against the Texas Compress Com-

---

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

pany. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Jenkins, Miller & Harris and Harrison & Woodruff, all of Brownwood, for appellant.

McCartney, Foster & McGee, of Brownwood, for appellee.

McCLENDON, C. J. The parties to this appeal, Citizens' National Bank of Brownwood, and the Texas Compress Company, will be referred to, respectively, as the bank and the compress. The appeal is from a judgment upon a directed verdict in favor of the compress, in an action brought by the bank to recover the value of 53 bales of concentration cotton. The compress had held the cotton under warehouse receipts which we will refer to as cotton tickets issued to Richardson & Co. and had later delivered the cotton to a railroad company under shipping instructions furnished by W. L. Ellis. The bank sued as owner and pledgee of the cotton and as assignee of Richardson & Co.'s cause of action. The compress defended on the contention that the cotton was rightfully delivered by it under the Ellis shipping instructions, in that such delivery was directed by Richardson & Co. under the bank's authority, actual or apparent. The compress also impleaded Ellis; but, as he is not a party to the appeal, that phase of the case will not be further noted.

The statement of facts is quite long and unnecessarily prolix. In many instances the testimony is obscure and the witnesses difficult to follow. Each party contends that it was entitled to a directed verdict. After a careful examination of the entire record, we have reached the conclusion that the case presents the following issues of fact:

First, whether under the arrangement which Richardson & Co. had with the bank and the manner in which the cotton was generally handled as between the bank, Richardson & Co., and the compress, there was authority, actual or apparent, in Richardson & Co. to direct the cotton shipped in such manner that the bill of lading would not be subject to the control of Richardson & Co.; and, if so,

Second, whether the instructions under which the compress acted were sufficient to authorize delivery of the cotton to the railroad company under the shipping instructions furnished by Ellis.

We make the following statement from the evidence noting where conflicts are presented:

A. H. (Dick) Richardson was engaged in the business of buying and selling cotton at Brownwood, under the trade-name of Richardson & Co. At the beginning of the 1924 cotton season, he made an arrangement with the bank to finance him during the season without margin. Under this arrangement he bought cotton, either locally, or at outside points, and shipped it into Brownwood. The bank paid for the cotton by honoring drafts or checks of Richardson with compress receipts attached in case of local purchases, or in case of outside purchases by paying drafts with bills of lading attached after acceptance by Richardson. Cotton shipped from other points was designated "concentration cotton" (see Mo., K. & T. R. Co. v. Capital Compress Co., 50 Tex. Civ. App. 572, 110 S. W. 1014); and the manner in which it was handled when inbound was as follows: Cars in which it was loaded were placed by the railroad company at the compress platform; the cotton was taken possession of, unloaded, and held by the compress, and a ticket covering each bale was delivered by the compress to the railroad company. These tickets were in turn delivered by the railroad company to the owner of the cotton upon surrender of the bill of lading properly indorsed. The same character of ticket was issued whether for local or concentration cotton, and after its receipt and issuance of tickets there was no difference in the manner in which it was handled by the compress. These tickets appear to have been treated by all parties as representing the cotton or as evidence of its ownership, and while usually surrendered by the party to whom originally issued direct to the compress, there were instances in which the cotton buyers traded among themselves, and the tickets of one buyer would pass to another buyer. Under the arrangement between Richardson and the bank, the latter upon payment of a check or draft would charge the amount thereof to Richardson's account and hold the tickets or bills of lading as collateral. It is not entirely clear from the evidence whether, in exchanging bills of lading for tickets, the exchange was made direct between the bank and the railroad company, or whether this was effective through Richardson.

The usual manner in which cotton was shipped out follows: Richardson, either in person or through L. M. (Buddie) Richardson, his employee, would apply to the bank for so many tickets covering sales made by him. These tickets would then be delivered to Richardson or to L. M. Richardson (whom we will call Buddie for convenience), the bank taking what the witnesses term a duebill for the tickets. Shipping instructions would then be made out by Richardson or Buddie, which would contain the necessary information to the compress with reference to preparing the cotton for shipment, and to the railroad company for the purpose of making out bill of lading. Each cotton buyer had his own printed forms covering his shipping instructions, or "shipping lists," as they were usually designated. At the time tickets were delivered to the compress, shipping lists would also be furnished, and when this was done the compress would compress and otherwise prepare the cotton for shipment, load it into cars, and deliver it to the railroad company, together with a copy of the shipping lists. The railroad company

would then issue a bill of lading in accordance with the shipping lists so furnished. The evidence seems clear that usually the compress had nothing to do with seeing that the bill of lading got intó the proper hands, although there is testimony that in some instances, when there would be no one present to receive the bill of lading, it would be turned over to the compress for delivery to the owner when called for. The evidence is without conflict that the bank intrusted to Richardson entirely the matter of delivering tickets and shipping lists to the compress. There was evidence to the effect, however, that usually shipping lists so delivered required that bill of lading be in favor of Richardson, or, as the witnesses express it, that the cotton be cleared to Richardson. It was conceded, however, that this was not the universal rule, and that there were instances other than that involved in this suit in which Richardson's cotton was cleared to the party to whom he had sold it. Richardson contended that this was done only in case of sales to Gosho & Co., a Japanese firm, and in each instance the shipping instructions, while made out by Gosho & Co., were delivered to the compress through Richardson and he received the bill of lading and delivered it to the bank.

The circumstances under which the 53 bales were delivered to the railroad company under the Ellis shipping lists follow: Prior to September 29, 1924, Richardson had contracted to sell Ellis for future delivery 300 bales at 20$\frac{7}{16}$-cent basis, in two lots, one of 100 and the other of 200 bales. On September 29, 1924, he further contracted to sell Ellis 100 bales at 23.53 basis. Ellis was demanding delivery under the first two contracts, claiming that he had sold cotton to other parties who demanded delivery, and Richardson was claiming inability to make delivery on account of the failure of delivery by parties from whom he had purchased. In the meantime the price of cotton had advanced, and on September 29, 1924, there was a net loss to Richardson of about 3 cents a pound on the first two sales based on the market of that date. Ellis testified that on that date he made an agreement with Richardson, whereby the 53 bales were to be delivered to him on the 200-bale contract at 20$\frac{7}{16}$, he was to credit Richardson with the amount, and whenever a settlement was had he was to pay Richardson any balance that might be due him. There is very strong corroboration of this testimony in a letter written by Ellis to Richardson on October 7th, and an attached statement of account. This letter and statement Richardson acknowledged having received. He also admitted that he authorized Ellis to buy in cotton for his account, so as to close out his contracts on October 7th in accordance with this letter and statement. The statement clearly shows that the 53 bales in question were credited to Richardson's account on the 200-bale contract at 20$\frac{7}{16}$-cent basis, after having been classed and graded at 6 points above middling. The testimony of Richardson on this point was that he never finally agreed with Ellis on the grade of the cotton, and never agreed to deliver it to him on the 200-bale contract; that he did not interpret the letter and statement of October 7th as showing that Ellis had got the 53 bales in question; and that he protested against the statement. He also testified that he never knew Ellis got the cotton, or that it had been shipped out, until about the 1st of January, 1925. Whatever criticism may be passed upon the testimony of Richardson, we are not prepared to hold that it is of such character as to be without probative force. The evidence shows that samples for this cotton were delivered by Buddie to Ellis; and that Buddie knew from the books that Richardson "owed Ellis cotton." He denied that Richardson told him to deliver the samples to Ellis, but a very strong inference is drawn from his testimony that Richardson knew of, if in fact he did not instruct, such delivery.

At the time Buddie got the 53 tickets from the bank, he also got 43 others. The bank examiner was then at the bank and made some objection to the manner in which cotton tickets were handled, and the cashier, Harrison, on turning over the 96 tickets to Buddie, instructed him to get a receipt from the compress. Buddie testified that he delivered the 96 tickets to Howlett, bookkeeper of the compress, informing him that the bank wanted a receipt for them. Upon Howlett's wishing to know the reason, Buddie called Harrison on the telephone and put him in direct communication with Howlett, and the bank's position in the matter was explained. Howlett denied this conversation, and testified that the receipt was on the usual form of the company and like receipts were always given upon the surrender of tickets upon request. Buddie admitted that on other occasions he had received such receipts when demanded. Howlett testified with reference to the delivery of the tickets, as follows:

"He (Buddie) pitched those receipts on my desk along with some other shipping lists, and he says: 'Here is 53 compress receipts. We have sold the cotton to W. L. Ellis, who will furnish you shipping instructions.'"

Buddie's version of the conversation with Howlett is as follows:

"When I took those tickets down there, I didn't tell him (Mr. Howlett) that here are tickets for W. L. Ellis, that he has bought this cotton, nor that we have sold it to him and he will give you shipping instructions on it. I told him we was going to deliver W. L. Ellis some cotton. I left those tickets there so they could get the cotton shipped—that W. L. Ellis was going to ship it—for them to give me instructions where they wanted to ship it. I really understood, when I left there, that they represented a sale to Mr. Ellis, and that the

cotton was afterwards to be shipped out. I understood Mr. Ellis had purchased it. I didn't tell them he had purchased it; I said, 'This cotton is going to be delivered to W. L. Ellis & Co.'"

Howlett further testified that in a telephone conversation between Richardson and himself on the morning of September 30th, he inquired, "What about these 53 tickets, I haven't any dope, I think, yet," to which Richardson replied, "W. L. Ellis will give you the dope on that." Richardson denied this conversation.

The testimony of the bank officials was that they had no knowledge that the cotton had been shipped out until about January 1, 1925. Harrison testified to having kept track of the collateral of Richardson, and to having checked the account at various times. He testified that in November, 1924, an apparent discrepancy was discovered in the account, due to some error, which after careful checking was cleared up. At that time he communicated with the compress over the telephone, and compared the number of bales the bank claimed to hold with the number the compress held in the name of Richardson; and that this checking showed no discrepancy between the bank's account and that of the compress, the former including the 53 bales in question as still being held by the compress for Richardson. This conversation is denied by the compress witnesses. There is a great deal of conflict among the witnesses with reference to statements made at different times in regard to the transaction, which we do not deem important to note. We think the only controlling issues of fact upon which there is a conflict in the evidence are those first above announced, and we think the evidence is of such character that each of those issues is raised as one of fact on which the evidence will support either an affirmative or negative finding.

The compress receipts or cotton tickets in question were upon the following form:

"Texas Compress Company. No. ———.
"Brownwood, Texas, ———, 19—.

"Received for account of ——— one bale of cotton, covered by above tag number (and more fully described by public weigher's certificate). Deliverable upon return of this receipt and payment of all storage and service charges accruing under tariffs issued by this company.

"As this cotton is stored for concentration and compression, the weight, grade and condition of contents is unknown to undersigned. Any prior liens are unknown to us. A lien is reserved for all storage and service charges accruing under tariffs of the company, and for all other lawful charges, the amount of which is unknown at this time. This bale is under shelter.

"Not responsible for invisible damage, loss or damage by fire, flood, unavoidable casualty, natural shrinkage or weather damage accruing on cotton received wet.

"No insurance of any kind is carried on this bale by the undersigned. Storage rate of 25¢ per bale per month or part thereof.

"[Signed] Texas Compress Company,
"———, Supt."

In 40 of these tickets the blank for the owner's name was not filled in, and in the other 13 the words, "Richardson & Company," were inserted. It is conceded by both parties, however, that the receipts issued in blank had the same effect as if "Richardson & Company" had been inserted therein. The receipt which the compress delivered to Buddie for the 96 bales, including the 53 bales in question, was as follows:

"Brownwood, Tex., Sept. 29, 1924.

"Memorandum of Tickets Surrendered. Messrs. Richardson & Co. have surrendered 96 tickets for 53—26— H.H.H. 11 H.H. 6—B/C to be compressed and shipped over ——— R. R. as per Shipping List No. ———.

"This cotton continues at owner's risk as per terms and conditions specified in ticket surrendered. [Signed] Texas Compress Co., E. J. Robertson, Supt. N.H."

At the conclusion of the evidence the bank requested peremptory instruction in its favor. This the court refused, and the bank then requested the following special issues:

(1) "Did Richardson & Co., or A. H. Richardson, sell the 53 bales of cotton in controversy to W. L. Ellis on September 29, 1924?"

"If you should answer the foregoing question, 'No,' you need not answer the following question, but if you answer, 'Yes,' then answer the following question:"

(2) "Did Richardson & Co., or A. H. Richardson, have authority from the plaintiff, the Citizens' National Bank, to make such sale?"

The judgment recites that the court upon consideration of request for these issues was of opinion that—

"From the undisputed evidence, said requests do not embrace matters required to be submitted to the jury, and that if such requests cover disputed issues that such issues are not material or controlling; and no other request for the submission of issues having been made, the court did thereupon resolve and find all other disputed issues of fact in favor of the defendant, Texas Compress Company."

The judgment further recites that "thereupon" the compress requested a peremptory instruction in its favor, which request was granted, "though the plaintiff then and there objected and in open court excepted to the giving of such instruction."

[1] The compress contends that the special issues requested were not involved in the case or, if so, were not controlling, and that since each party requested a peremptory instruction and the bank made no request for submission of issues other than the two above quoted, the case was taken from the jury on all other controverted issues and the judge was authorized to make such findings thereon

as the evidence would support. In other words, that the bank waived a jury trial on all issues except those embraced in the two requested.

With reference to the effect of requests by both parties for directed verdict, the holding under the weight of authority in this country, to which we will refer as the majority rule, is expressed in the following language of Chief Justice White:

"The request made to the court by each party to instruct the jury to render a verdict in his favor was not equivalent to a submission of the case to the court, without the intervention of a jury, within the intendment of sections 649, 700, Revised Statutes. As, however, both parties asked the court to instruct a verdict, both affirmed that there was no disputed question of fact which could operate to deflect or control the question of law. This was necessarily a request that the court find the facts, and the parties are, therefore, concluded by the finding made by the court, upon which the resulting instruction of law was given. The facts having been thus submitted to the court, we are limited in reviewing its action, to consideration of the correctness of the finding on the law, and must affirm if there be any evidence in support thereof." Buetell v. Magone, 157 U. S. 154, 15 S. Ct. 566, 39 L. Ed. 654. See also Empire State Cattle Co. v. A., T. & S. F. Ry. Co., 210 U. S. 1, 28 S. Ct. 607, 52 L. Ed. 931, 15 Ann. Cas. 70, and Sampliner v. Motion Picture Patents Co., 254 U. S. 233, 41 S. Ct. 79, 65 L. Ed. 240.

Prior to the Buetell decision the Circuit Courts of Appeals were not in accord upon the question.

The majority rule is adhered to in the following jurisdictions: Alabama, Arkansas, Colorado, Georgia, Iowa, Kentucky, Michigan, New Mexico, New York, North Dakota, Ohio, Oregon, South Dakota, and Washington. To the contrary are the holdings in Illinois, Minnesota, North Carolina, Oklahoma, Tennessee, Wisconsin, and Vermont. For citation of cases, see notes in 6 Ann. Cas. 545; 13 Ann. Cas. 372; 28 Ann. Cas. 1342.

In the case of Tiblier v. Perez (Tex. Civ. App.) 277 S. W. 189, the majority rule was followed, citing cases from Arkansas and Kentucky. The opinion seems to indicate, however, that the question was not necessary to the decision in that under the evidence the directed verdict was proper.

The minority rule, and the reasons on which it is held to rest, are given in the following quotation:

"We are of the opinion that, under the true practice, the motion of each party should be treated for what it is, a matter wholly distinct from and adverse to that of his adversary; that neither is put in a worse position, so far as concerns his ultimate right of review, by his adversary's making a similar motion; that such motion should stand as if made and remaining alone, and should be disposed of on its own merits; that the only question submitted to the trial judge is the question of law above indicated; that, as a necessary preliminary to re-sponding to this question, he must determine whether there is any substantial conflict in the evidence; that if he finds such conflict, or undisputed evidence from which conflicting inferences may reasonably be drawn, on material points, he should submit the case to the jury; that if he is of opinion there is no such conflict, he should sustain the motion of one party or of the other, according to his view of the facts and the law; that the party whose motion has been overruled may have the action of the trial judge reviewed on appeal, without the necessity of asking the submission of any special question or questions to the jury; that on such appeal he may attack the action of the trial judge, in overruling his motion and in sustaining that of his adversary, and may put forward his contention of the facts and assail that of his adversary; and the appellate court will for itself ascertain the facts, and will determine whether the trial judge should have sustained the one motion or the other, or should have submitted the case to the jury." Virginia-Tennessee Hardware Co. v. Hodges, 126 Tenn. 370, 149 S. W. 1056.

We are in full accord with the reasoning in this quotation, and particularly so as applied to the practice in this state. The provisions of our statutes regulating the judge's charge to the jury in civil cases are contained in subdivision 4 of chapter 8, title 42, R. S. of 1925, embracing articles 2184 to 2190, inclusive.

By article 2184 it is made the mandatory duty of the trial judge, "unless expressly waived by the parties," to deliver a written charge to the jury, whether it be a general charge or on special issues. Under article 2189 the charge may be general or on special issues, at the discretion of the court, in the absence of request by either party for special issues. Under article 2185 the court's charge must be prepared, submitted to counsel, and reasonable time given them to examine it and make objections, before it is read to the jury. Article 2186, relating to special charges, has no reference to special issues further than as regards such special charges as the parties may desire in explanation of special issues actually submitted by the court. The provisions of article 2190, to the effect that failure to submit an issue not requested shall not be deemed ground of reversal and that an issue not submitted shall be deemed as found by the court in support of the judgment if the evidence warrants the finding, clearly have reference to cases which are in fact submitted upon special issues, and not to those taken from the jury under peremptory charge.

The request for a directed verdict has been recognized for many years, in this state, as a proper method for obtaining a ruling of the court upon the legal effect of all the evidence in the case, whether made by the defendant at the close of plaintiff's evidence, and before defendant has offered any proof, or by either party after both have rested. In

the case of Eberstadt v. State ex rel. Armistead, 92 Tex. 94, 45 S. W. 1007, the Supreme Court pointed out the difference between such request and a demurrer to the evidence in civil cases, holding that the party making the request merely called for a ruling upon the legal effect of the testimony introduced by his adversary, and waived no right to proceed further with the case, in the event the request was denied; whereas, a demurrer to the evidence after issue joined thereon by the adverse party admitted the truth of all evidence that might be construed adversely to the party urging the demurrer, and took the case from the jury, except upon the question of the amount in case of unliquidated damages. Neither procedure submits any fact issue to the judge. If the request for peremptory instruction is denied, the case must proceed as if no request had been made. If the demurrer to the evidence is overruled, the case is terminated except as to amount of unliquidated damages, and upon all other issues the judgment must be for the opposing party. Galveston, H. & S. A. R. Co. v. Templeton, 87 Tex. 47, 26 S. W. 1066.

[2] The provisions of the articles cited requiring the parties to make objections to the charge, to submit special charges, and to request desired special issues, have no reference whatever to a peremptory instruction. This was the holding in Walker v. Haley, 110 Tex. 50, 214 S. W. 295, from which we quote the following language of Chief Justice Phillips:

"When a court determines upon a peremptory instruction, the ruling decides the cause. It is a determinative decision upon the effect of the evidence. It is reached, as a rule in the actual practice, only after the argument of counsel in which the opposing view is presented and of which the court has the full benefit. Since the action of the court is a ruling on the effect of the evidence, there is nothing for counsel to object to after the ruling is determined. The judge having ruled upon the question, deliberately it will be assumed, it is to be supposed that he will adhere to his ruling. There is nothing in the act to indicate that in this situation counsel were to have imposed upon them the useless procedure of going through the form of presenting written objections to the medium—the peremptory instruction—through which the ruling is made effective.

"The 'charge of the court' with which the act deals, is a charge applying the law to the facts of the case for the jury's guidance, a charge for that end, and which for supposed errors may be open to correction. It has no reference to a direction of the verdict, which leaves the jury with no province, and subject, therefore, to no influence from a charge; which is not a 'charge' at all in any true sense, but only the means of giving effect to the sustaining of a demurrer to the evidence; and which, if erroneous at all, is so, not because of any defect in the direction, but because of the court's mistaken view as to the effect of the proof."

[3] We are clear in the view that under our practice a party waives no right by moving for a directed verdict in his favor, and this regardless of whether the opposing party has made a like motion. When the request or motion is denied, he stands in the same attitude, as regards the further progress of the trial, as if no motion had been made. The motion cannot be treated in any sense as the express waiver, required by article 2184, of a written charge by the court to the jury on the law of the case, either general or on special issues.

In those jurisdictions adhering to the majority rule it is generally held that a request for directed verdict does not waive a jury where the right is expressly reserved or where timely request for jury findings is made; and timely request is held to mean "at any time before the directed verdict is actually rendered by the jury, but not thereafter." However, "the motion (to go to the jury) must specifically point out the questions of fact which it is desired should be passed on by the jury.". 38 Cyc. p. 1584.

[4] The compress does not contend that the bank waived the right to have the special issues which it requested submitted to the jury. Its contention is that the request amounted in effect to a request to submit the case on special issues, and only on the special issues presented, and waived a jury on any other issues the evidence might raise.

We are not prepared to concur in this reasoning. The articles above referred to, besides making it mandatory on the judge, in the first instance, "unless expressly waived by the parties," to prepare a written charge, require him to submit his charge to counsel, giving them a reasonable time to examine it and make objections before it is read to the jury. We find nothing in the language of these articles which imposes any duty on the litigant to submit charges or issues to the judge, before he has prepared his charge and delivered it to counsel. But even were we to concede, for the moment, that the trial judge has the power before preparing his charge, to require the parties to point out the controverted issues on which they respectively rely —and much may be favorably said as to the salutary effect of such rule—still, we think clearly such rule could not be extended so as to require one party to tender issues that are not essential to his own case, but which appertain to that of his adversary.

[5-9] In a trial by jury on special issues there must be an affirmative finding on every issue necessary to support the judgment. The power of the judge to make findings where none are submitted or requested does not extend to independent grounds of recovery or defense, but only to incidental or subsidiary findings necessary to support the judgment in connection with the issues in fact submitted to and found by the jury. A party may waive an issue upon which he relies for recovery or defense by not requesting its submission.

In such case the issue is treated as abandoned, and goes out of the case. There is no affirmative finding made thereon, and the judge is not given the power to make such affirmative finding, merely because the opposing party, upon whom no duty in that regard rests, has not requested its submission. The duty to request issues under any circumstances extends only to those respectively which are essential to the cause of action or defense of a party. There is no duty on the plaintiff to present purely defensive issues, and no duty on the defendant to present such as are essential to plaintiff's recovery. And where no duty is imposed no waiver can be imputed. These principles are deduced necessarily from the holdings in the following cases: Texas City Transportation Co. v. Winters (Tex. Civ. App.) 222 S. W. 541; Galveston, H. & S. A. R. Co. v. Price (Tex. Com. App.) 240 S. W. 524; Boatner v. Providence, etc., Insurance Co. (Tex. Com. App.) 241 S. W. 136; First Nat. Bank v. Rush (Tex. Com. App.) 246 S. W. 349; Kistler v. Latham (Tex. Com. App.) 255 S. W. 983; San Antonio Public Service Co. v. Tracy (Tex. Civ. App.) 221 S. W. 638; Texas Drug Co. v. Cadwell (Tex. Civ. App.) 237 S. W. 968; Texas & N. O. R. Co. v. Wagner (Tex. Civ. App.) 262 S. W. 902; Bateman v. Cleghorn (Tex. Civ. App.) 266 S. W. 422; Upham Gas. Co. v. Agnew (Tex. Civ. App.) 270 S. W. 1081; Amarillo Oil Co. v. Ranch Creek Oil & Gas Co. (Tex. Civ. App.) 271 S. W. 145; Abilene v. McMahan (Tex. Civ. App.) 271 S. W. 188; Chicago, R. I. & G. Ry. v. Hanna (Tex. Civ. App.) 273 S. W. 280; Fidelity & Casualty Co. v. Harrison (Tex. Civ. App.) 274 S. W. 1002; Rogers v. Fort Worth (Tex. Civ. App.) 275 S. W. 214; McLemore v. Compton (Tex. Civ. App.) 275 S. W. 487; Reynolds v. McMan Oil & Gas Co. (Tex. Civ. App.) 279 S. W. 939; Dalton Adding Mach. Co. v. Wicks (Tex. Civ. App.) 283 S. W. 642; Adams Nat. Bank v. Stone (Tex. Civ. App.) 284 S. W. 989; Coulter v. Gulf, C. & S. F. R. Co. (Tex. Civ. App.) 286 S. W. 559.

[10] The issues of fact above noted were urged by the compress as defenses to the bank's suit. The latter predicated its right to recover upon the following facts: That the compress received and held the cotton as a public warehouseman under compress receipts issued in the name of Richardson & Co., as owner; that these receipts were delivered by Richardson to the bank as security for his cotton account; that this placed the ownership of, or in any event a special property in, the cotton in the bank; that the compress was cognizant of the bank's title or interest in the cotton and failed to deliver it upon demand, and was therefore liable as for conversion. This theory of recovery was established by the bank, and it would have been entitled to a peremptory instruction but for the defensive issues above noted, which were supported both by pleading and evidence tendered by the compress. It was not the duty of the bank to frame and present these issues or otherwise to request their submission, and by failure in that regard it waived no right, and conferred on the judge no authority to make findings thereon.

Passing now to the merits of the case, we will consider the several contentions urged by the respective parties.

The bank contends, in the first place, that under the pleadings and evidence the compress was not warranted in delivering the cotton to Ellis—or, what was tantamount thereto, clearing it in the name of Ellis—regardless both of the authority, actual or apparent, from the bank to Richardson and of the instructions given by Buddie or Richardson to the compress. This issue is raised by exceptions to the pleadings, objections to the testimony, and request for directed verdict; and is based upon the construction which the bank urges to that portion of R. S. art. 5620 (Uniform Warehouse Receipt Law, § 9), reading:

"A warehouseman is justified in delivering the goods, subject to the provisions of the three following articles, to:

"1. The person lawfully entitled to the possession of the goods, or his agent.

"2. A person who is either himself entitled to delivery by the terms of a nonnegotiable receipt issued for the goods, or who has written authority from the person so entitled either indorsed upon the receipt or written upon another paper."

The bank contends that the compress was not justified in clearing the cotton to Ellis because (1) Ellis was not lawfully entitled to its possession, and (2) there was no written authority from either Richardson or the bank for his obtaining possession.

[11] We are in accord with contention (1) to the extent that, as between the bank and Ellis, the latter was not lawfully entitled to possession of the cotton, whether or not Richardson had in fact sold it to him under the arrangement to which Ellis testified. Richardson's authority to sell extended only to agreeing on the sales price and receiving the proceeds for the bank. The evidence will not support a finding that he had actual authority to deliver to Ellis on account. The question of apparent authority to make such sale was not involved. Ellis could not successfully defend in an action against him by the bank on the theory of innocent purchaser, because he did not part with anything of value in the transaction. It may be that the extent of his liability to the bank would be fixed by the price agreed upon between him and Richardson, but as that question is not here involved we express no opinion upon it.

[12] We overrule contention (2) to the effect that the compress was as a matter of law not justified in clearing the cotton to Ellis in the absence of written authority from Richardson or the bank. This contention,

(294 S.W.)

reduced to its last analysis, is that under provision 2 of article 5620 the compress could not defeat an action by the owner of the cotton even though he had in person surrendered the receipts to the compress and at the same time given verbal instructions to deliver to a third party. This contention gives to provision 2 the effect of a rule of evidence or statute of frauds, under which the authority of the owner could not be proved by parol testimony, however conclusive that might be, but must be proved by writing. We have examined the authorities cited by the bank and find nothing in them to support this contention. The section does not provide that the warehouseman is justified in making delivery only on the written authority of the party entitled to possession; and to give it that meaning would open the door to fraud by enabling an unscrupulous owner to repudiate his express verbal authorization, and thereby reap the beneficial fruits of his own wrong —a result which would be counter to the general policy of the law. Such construction should not be read into the statute, unless by its express language, or by necessary implication therefrom, it will admit of no other.

Our holding is that if Richardson or Buddie gave verbal instructions to the compress, the effect of which, if in writing, would authorize the compress to clear the cotton in the name of Ellis, and if Richardson's authority from the bank, either actual or apparent, was sufficient to warrant such clearing, both Richardson and the bank are bound in like manner as they would be bound had the instructions given been reduced to writing. A contrary rule would be out of harmony with the purposes of the act and counter to its policy.

[13] A further contention of the bank is that the receipt given by the compress to Buddie was in effect a trust receipt, showing that the cotton tickets were not surrendered to the compress for delivery of the cotton, but that the compress held them for Richardson and the bank, merely as trustee, and to all intents and purposes as if their possession had been retained. The language of the receipt expressly negatives this contention. It was in fact only what its headline denoted, a "memorandum of tickets surrendered," and declared that such surrender was for the purpose of having the cotton "compressed and shipped over ——— R. R., as per Shipping List No. ———." The "tickets" are thus declared to have served their purpose as warehouse receipts. The only thing remaining was the furnishing of the "shipping list." This receipt was delivered to Buddie, who in turn delivered it to the bank, and the latter accepted it in lieu of the "tickets," surrender of which it had authorized; and it was charged with knowledge that the cotton would be compressed and cleared for shipment in accordance with shipping list to be furnished. The only question which the case presented was whether the compress was justified in clearing the cotton under the shipping lists furnished by Ellis, and this question involves two other questions: (1) Whether Buddie or Richardson gave authority or instructions to Howlett to clear under lists furnished by Ellis; and if so (2) whether Richardson had authority from the bank to have the cotton cleared in that manner.

[14, 15] As already stated, we have reached the conclusion that there is conflict in the evidence upon each of these questions. This conclusion is controverted both by the bank and the compress, each contending that the evidence thereon is conclusive in its own favor. In overruling both contentions we will briefly state our views with reference to the conclusions and inferences which we think the evidence will support. We have set out above the testimony of Buddie, Howlett, and Richardson, giving their respective versions regarding the instructions under which the tickets were surrendered. It is only necessary to state in this regard that a conflict in the testimony is presented. Upon the issue of the authority in Richardson, actual or apparent, to have the cotton cleared other than to himself, the evidence is without conflict that in the case of sales to Gosho & Co. this was done, and no question as to his authority so to do is intimated by the bank. But the testimony of Richardson was to the effect that there were no other instances of this character, and in each of those the Gosho shipping lists were delivered by Richardson (or his agent) direct to the compress at the time the cotton tickets were surrendered and that the bill of lading was delivered to him. The effect of his testimony was that it was not of material consequence to whom the cotton was cleared so long as Richardson had it in his power to obtain possession of the bill of lading, and this power he always reserved by having the shipping lists of Gosho pass through his hands. The evidence is sufficient to sustain a finding that this is the only instance in which the Richardson cotton was cleared under shipping lists delivered direct by the buyer to the compress. This evidence, we think, raised the issue of Richardson's authority to have it so cleared.

From what has already been said, it follows that the special issues tendered by the bank were not controlling. Those issues are manifestly predicated upon the theory that the only hypothesis upon which the compress could justify clearing the cotton to Ellis was to establish actual ownership in Ellis through sale by Richardson under authority of the bank, thereby bringing Ellis within the purview of subdivision 1 of article 5620 as being "the person lawfully entitled to the possession of the goods." If Richardson alone had been interested in the cotton, the sale Ellis testified to would bind Richardson and defeat his recovery. That issue was therefore pertinent in so far as the bank sued as assignee of

Richardson's cause of action. Such sale, however, would not be binding on the bank in the absence of actual authority in Richardson to make it. He did not have such authority, as we have shown above. On the other hand, a finding that such sale was not made would not be conclusive on the rights of the compress, for, regardless of the actual dealings between Richardson and Ellis, the compress was justified in clearing the cotton as it did, if its action therein was a proper deduction from instructions of Richardson, and the latter had authority, actual or apparent, to bind the bank in giving such instructions.

We conclude that the trial court committed error in directing a verdict for the compress, for which the judgment is reversed and the cause remanded for a new trial.

Reversed and remanded.

## On Rehearing.

Formal motions for rehearing were filed by both appellant and appellee, and these motions overruled at our last sitting. Since entering these orders, both parties have filed written arguments in support of their respective motions. These arguments we have carefully considered, although reaching the court after the motions were overruled.

The points presented in appellant's argument have been fully covered in our original opinion.

Appellee has filed a very able and elaborate argument, which questions our holding to the effect that, when no request for submission of an issue is made, that issue is treated as abandoned and goes out of the case. It is conceded that our decision is supported by the several cases cited in our original opinion. However, it is contended that those decisions are at variance with the language of the statutes under construction, and in conflict with the case of Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132. In this connection our attention is again called to the opinion in McKenzie v. Withers, 109 Tex. 255, 206 S. W. 503, to the effect that opinions of the Commission, where not adopted by the Supreme Court, are not authority.

There are expressions in the Moore Case and in a number of other opinions, both by the Supreme Court and the Courts of Civil Appeals, which, taken generally and in the abstract, may be construed as contrary to our holding in this case and those in the cases cited in support of it; but an examination of the question before the court in the Moore Case, and in each of the cases whose general language is apparently to the contrary, will disclose the fact that the question presented here and in the cases cited in our original opinion was not then before the court. The exact question at bar appears first to have been authoritatively passed upon in an able opinion by Chief Justice Fly in Service Co. v. Tracy (Tex. Civ. App.) 221 S. W. 638, from which we quote:

"If a plaintiff can allege separate acts of negligence, acquiesce in the submission of only one of them to a jury, and then sustain the verdict on a ground of negligence upon which the jury did not pass, but which it is presumed was found by the judge, jury trial would become a farce, and the ultimate decision on facts as to other grounds of negligence would rest with the judge. Article 1985 [present article 2190] of the Revised Statutes is not elastic enough to stretch to that extent. It simply means that, where a jury has passed on certain issues as to a certain case submitted to them, if there be evidence as to other necessary matters connected with the issues found by the jury, it will be deemed that the court found on such matters in order to support the judgment."

The next case upon the exact question was Transportation Co. v. Winters, 222 S. W. 541, by the Commission of Appeals. These decisions have been repeatedly followed by the Commission of Appeals and by the several Courts of Civil Appeals; and in many of the decisions of the latter writs of error have been denied.

In Transportation Co. v. Winters, the question was essential to the judgment recommended by the Commission, which was adopted by and made the judgment of the Supreme Court, and as said by us in Oil Co. v. Meredith, 258 S. W. 556:

"Until further light is shed upon this subject by the Supreme Court, we think the holdings of the Commission which are essential to the judgments adopted are entitled to be regarded as having the express sanction of the Supreme Court, and therefore to be followed as authority."

In view of the long line of decisions, both by the Commission of Appeals and the several Courts of Civil Appeals, the question here presented, we think, should be regarded as a settled rule of practice in this state.

[16] There is a further consideration in this regard which we think entitled to great weight. The cited decisions of the Commission and quite a number of those by the Courts of Civil Appeals were rendered prior to the codification of the Civil Statutes in 1925. In that codification no substantial change was made in the practice statutes here involved, and this codification constituted a re-enactment of those statutes. The familiar rule that the re-enactment of a statute without substantial change carries with it the previous construction placed thereon by the courts is clearly applicable here.