**SEALITE, INC., Appellant,**

v.

**TEXAS WAREHOUSE CO. OF DALLAS,**
Appellee.

No. 17238.

Court of Civil Appeals of Texas.

Dallas.

Feb. 14, 1969.

John F. Maxfield, Stigall, Maxfield & Collier, Dallas, for appellant.

Ralph D. Churchill, of Brundidge, Fountain, Elliott & Churchill, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

Action to recover damages for conversion of personal property. Sealite, Inc. brought suit against Texas Warehouse Company of Dallas, Inc., alleging that it had stored certain goods and materials with the warehouse company and that such company had wrongfully and unlawfully converted same.

Defendant warehouse denied that it was guilty of conversion of the merchandise and, by trial amendment, alleged that it had delivered the personal property back to Sealite pursuant to instructions from one of its agents.

The case was tried before the court and a jury and in response to Special Issue No. 1 the jury found that the warehouse company did not convert any of the property owned by Sealite. In answer to Special Issues 5, 6 and 7 the jury found that one Raymond Blackburn had instructed the warehouse company to ship Sealite's goods back to Sealite in California; that Blackburn had actual authority to give such instructions; or that Blackburn had apparent authority to give such instructions concerning shipping of the goods. Prior to entry of judgment Sealite filed its motion for judgment *non obstante veredicto* in which it contended that there was no evidence to support the jury's answers to Special Issues 5, 6 and 7 and that the answer of the jury to Special Issue No. 1 should be set aside and disregarded because the warehouse company was guilty of conversion, as a matter of law, pursuant to the express provisions of the Uniform Warehouse Receipts Act. The trial court overruled the motion for judgment *non obstante veredicto* and rendered judgment based upon the jury's verdict decreeing that Sealite take nothing against the warehouse company. Sealite appeals. We affirm.

Consideration and resolution of appellant's points require a careful review of material antecedent facts. At all times material herein Texas Warehouse Company operated a warehouse for storing merchandise in the City of Dallas. Sealite, Inc. was a California corporation, duly admitted to do business in the State of Texas, having its principal place of business in California. In the early part of 1958 Sealite was looking for a warehouse in Dallas in which to store its merchandise and to conduct its business affairs which involved the sale of various plumbing supplies. Appellee warehouse company had quoted appellant its warehouse charges for storage and also advised appellant that it had available a small office which it would rent for $25 per month and a telephone answering service that would be $15 per month. In response to such offer, on February 18, 1958, appellant wrote a letter advising appellee that following an inspection of appellee's facilities, its representative, Mr. H. A. Woods, had advised that appellee could render better service than any other company in Dallas. It was therein stated that a shipment of material was being forwarded from California to appellee's warehouse. The letter contained this paragraph:

"Your Company is hereby authorized to release material or ship it to any customer that may place an order, either verbal or in writing. You are further authorized to release material or make shipments as requested by Mr. H. A. Woods, Jr. or Mr. Rush O'Bryan, P. O. Box 24003, Houston, Texas.

"Shipments are to be made by common carrier, freight collect, unless the customer requests that freight be prepaid and invoiced. In the latter case prepay the freight and advise us of the charges to our account."

Appellee received the initial shipment of merchandise from appellant and issued its non-negotiable warehouse receipt therefor, said receipt containing the following provision:

"Said property to be released only after payment of all storage, handling and other charges. The Texas Warehouse Co. claims a lien for all lawful charges for storage and preservation of goods, and also for lawful claims for money advanced, interest, insurance, transportation, labor, weighing, coopering and other charges and expenses relating to storage and handling of said goods."

Thereafter, from time to time appellee would release merchandise upon verbal request of various representatives of appellant to appellant's customers in Dallas. These materials would be shipped to the customer by carriers based on bills of lading without necessity of surrender of warehouse receipts. From time to time appellee would bill appellant not only for storage charges but for inventories, bills of lading, expenses of classifying shipments, etc. Trouble developed between the parties concerning appellant's failure to pay statements from appellee and on October 11, 1960 appellee wrote appellant complaining of the fact that appellant had been slow in paying its accounts. The letter said, in part: "As it is I now insist you forward a check in full by return mail, and keep your account on a current basis or make other arrangements for your merchandise."

Again, on October 18, 1960 appellee wrote appellant calling their attention to the fact that they had not paid a freight bill covering merchandise shipped by appellee to appellant's customer.

On October 14, 1960 appellant wrote appellee contending that many of appellee's bills were incorrect. Appellant said: "The suggestion you make to move our business elsewhere has merit. We will consider it carefully."

The record reveals that the basis for many of the disputes between the parties concerning charges grew out of transactions between Raymond Blackburn, who had succeeded others as the local representative and agent of appellant, and appellee company. On November 11, 1960 appellant wrote appellee a letter in which it reviewed a number of the invoices which had been forwarded in 1960 and contended that many charges, especially those authorized by Blackburn, were not justified. In one paragraph of this letter appellant said: "Mr. Blackburn is a salesman for our Company. He has no authority to employ you or anyone else to perform services for our Company at our expense. If he requested work done, charge such work to him."

In the same letter appellant said: "Demand is hereby made upon you to release all property belonging to us at once and to notify us of such release so that arrangements can be made to move it. If this is not done, any and all damages that we may sustain will be assessed against your Company."

Following that letter Blackburn continued to be the agent and representative of appellant in Dallas and on December 1, December 20, December 22, 1960 and on January 17, 1961 appellee company released and shipped C.O.D. various merchandise belonging to appellant on verbal instructions from Blackburn to Duncan Plumbing Company, Service Plumbing Company and Elm Fork Construction Company. On each of these occasions the money received from the sale of these goods was duly credited to appellant's account.

On February 8, 1961, when the disputed account was less than $20, appellee delivered to Transcon Freight Lines all of the remaining merchandise billed by it and owned by appellant, same being consigned to Sealite, Inc.'s plant at San Leandro, California. The standard bill of lading was issued covering the merchandise shipped and it is without dispute that it was shipped

C.O.D., or freight charges collect. When the merchandise reached California appellant refused to accept same or pay the freight charges and receive the merchandise. Repeated demands were made upon appellant by Transcon to accept the merchandise. Appellant, on June 20, wrote to Transcon and requested that the merchandise be held pending further disposition but since the freight charges were not paid the merchandise was finally sold by Transcon to satisfy its lien. The record is silent as to the disposition of the proceeds of the sale by Transcon. This action was then filed.

The testimony presented at the trial was indeed conflicting concerning the facts surrounding the delivery of the merchandise by appellee to Transcon for delivery to appellant in California. The facts are also disputed concerning the actual and apparent authority of Blackburn to bind appellant concerning disposition of the merchandise.

Miss Barbara Taylor, president of appellee corporation, testified that her warehouse operated under the Uniform Warehouse Receipts Act of Texas and that a non-negotiable warehouse receipt was issued for goods received. As to the custom of doing business between appellant and appellee Miss Taylor testified:

"Q And then you hold those goods until the warehouse receipt is surrendered or until partial written authority to release a portion of the goods under the warehouse receipt; is this correct?

A We hold the merchandise until we are told where and how to ship the merchandise.

Q Well, it could be by surrender of the warehouse receipt or it could be by a written request to release a portion of the goods under the warehouse receipt. Is that right?

A It depends on the company; each company is different. You release it only on company approval though.

Q All right. Now then, as goods would come into your warehouse from Sealite, Inc., you would store the goods and issue a warehouse receipt. Correct? And the goods would be released upon company authority how? By bill of lading or how would you —

A Well, anything that leaves the warehouse must have a bill of lading and the bill of lading is issued on instructions per individual firms.

Q And it comes in on a—you have a written instruction to release them —

A. Not always, no. You have—in the case of Sealite, an approved list, or the salesman gives us orders; their representative.

Q Do you have an approved list of people to whom you would release goods?

A Yes.

Q Where is it?

A I imagine Mr. Churchill has it. I assume it is in the file. On Sealite we released per Mr. Ferguson, per his representatives, and there was also a list of approved customers and approved can be either open account or COD. They would tell us what to do.

Q Well, what you are saying then is, if they were on the approved list you wouldn't have to have written authority; if they weren't on the approved list, then you would have to have approval from Mr. Ferguson?

A The list or instructions always came from them, as well as notice of past due accounts. If we received a notice of a past due account, we didn't ship them until we heard otherwise.

Q But the listings that you got were always from Mr. Ferguson or his representative?

A From his representative, yes, or instructions * * *."

She further testified that on many occasions a representative of appellant would call in and request them to ship goods and it was customary to ship them without obtaining the warehouse receipt for the items released.

As to several disputes which arose concerning bills she testified that:

"Q I will ask you whether or not on the 18th of October, 1960, if you didn't so advise Sealite that you wouldn't make any more shipments out of the warehouse for them?

A I believe you will find it was after Mr. Ferguson called and issued orders to have everything returned to California and I said, 'Fine, pay your past due account first.'

Q Did you refuse on October 18th, to tell them that you refused to ship any more goods out of your warehouse?

A Until they paid their bill."

Concerning the details of what transpired to cause appellee to ship the goods back to California to appellant, Miss Taylor testified:

"Q Calling your attention to—I believe it was February 8, 1961, what transpired on that date to cause you to ship those—that goods, wares and materials· to Transcon?

A Their representative, Mr. Blackburn, came to the office. He told us that he had received a call from Mr. Ferguson— * * *. That he received a phone call from Mr. Ferguson at home that morning, telling him to inform us that if we did not return all the merchandise that day that he would file suit, and that he was to phone Mr. Ferguson back our decision, and we decided that even though we showed some still open on the account that we wanted no trouble; to get it behind us. So on that basis we shipped it. He knew it and supposedly called Mr. Ferguson, but Mr. Ferguson earlier testified that he was in town on the 7th.

Q What I was interested in is just what transpired.

A We were told to return them that day period, by his representative.

Q You were told by Mr. Blackburn to either ship it or be sued?

A That's correct.

Q And so you shipped it?

A We shipped it.

Q All right, that very same day?

A That same day.

*   *   *   *   *   *

Q Were you ever told by Mr. Blackburn or Mr. Ferguson or by any ways that these goods were to be shipped to another local warehouse?

A No.

Q In other words, the instructions that you said before, was either ship them or you would be sued?

A That's correct."

Miss Taylor further testified, on cross-examination:

"Q Did you have any letters from Mr. Ferguson other than the letter of November the 11th concerning any method of disposition of the goods?

A No, we were never told what to do with the goods until we were told to return them to the factory.

Q What your testimony is that subsequent to the letter of November the 11th, you had no written communications from Mr. Ferguson concerning disposition of the goods that were in your warehouse, but that on February the 8th, or thereabouts, 1961, you shipped these

goods collect to California on the authority of Mr. Blackburn. Is that what you are saying?

A That's correct."

Concerning the status of Mr. Blackburn as an employee or representative of appellant, Mr. Ferguson, president of Sealite, testified that Blackburn had been employed by Sealite as a salesman or representative in the Dallas area which included the area from Midland to the west to the Louisiana line on the east and as far south as Waco, Texas. He was to call on potential customers in that area, sell them merchandise, and service the customers he sold. He had succeeded Mr. Meyer in this job and his responsibilities were the same as Mr. Meyer's. Mr. Blackburn also was to be responsible for taking inventory of stock on hand in the warehouse and to try to forestall the possibility of errors in shipment of goods. In his correspondence he referred to Mr. Blackburn as "representative". He denied that Blackburn had authority to instruct anyone to ship goods C.O.D. to customers. He testified that at the time in question Mr. Blackburn was the only resident man Sealite had in Dallas. He positively and unequivocally denied that he had instructed Blackburn to advise Miss Taylor to ship the goods owned by Sealite back to the company or else be sued. He said that Blackburn did not have authority to give such instructions.

Miss Taylor testified concerning Mr. Blackburn's activities on behalf of Sealite that he would give verbal orders to the warehouse to ship goods to customers and that he took an inventory at least once a month. She said this inventory was required to be taken by a representative of Sealite and that Mr. Blackburn did this for the company. She testified:

"Q Would he [Blackburn] ever or not give you any instructions from the home office?

A Oh, yes.

Q Now, specifically, what type of instructions would that be?

A Who to ship, where, maybe what was coming in; just anything in general that might pertain to the operation."

On cross-examination she testified:

"Q Now, then, on your instructions from Mr. Blackburn on where to ship, were these charge customers?

A You mean during the entire time he was with Sealite?

Q Yes.

A Some were charges and some were not.

Q Were some of them C.O.D."

A Yes.

Q Now, can you name some of them?

A Not offhand, no.

Q Actually, there weren't any C.O.D.s until you made those sales of goods in December, were there?

A No, there were some C.O.D.s."

Further, on cross-examination, she testified:

"Q You say Mr. Blackburn told you to sell those C.O.D.? [referring to sales made in December 1960 and January 1961.]

A Yes."

Again, testifying concerning the four sales made in December 1960 and January 1961 Miss Taylor testified:

"Q Just one or two more, Miss Taylor. Now, you stated on your cross-examination that Mr. Blackburn was present when the four deliveries and the total cash was received, totalling $190 some odd dollars. Is that correct? Mr. Blackburn was present during that time?

A Yes. On one or two instances he actually was with the customer.

Q He actually brought somebody—

A Everything came through Mr. Blackburn on the four orders.

Q Now, let me get this straight. You didn't make the sale at all, did you?

A No.

Q It was Blackburn that made the sale. Is that correct or not?

A That's correct."

Further, on recross-examination she testified:

"Q At the time you made the sales in December and in January, did you have written authority to take C.O.D.s from Duncan Plumbing and Elm Fork and whatever that other one was?

A Yes.

Q You had written authority?

A No, I didn't have written authority; I had Mr. Blackburn's oral authorization."

In view of the above testimony we cannot agree with appellant that there was no evidence to support the jury's finding to the effect that Blackburn instructed the warehouse to return the goods to Sealite in California and that in so doing he acted with actual or apparent authority. This is more especially true with reference to the issue concerning apparent authority. It is without dispute that Blackburn was hired by Sealite as a "representative" or sales representative in the Dallas area and that he was held out by Sealite to the general public as such. Insofar as his dealings and relationships with appellee are concerned it is without controversy that he passed on instructions from Sealite to the warehouse company; that he made sales and gave verbal instructions to the warehouse to deliver goods to customers; that on none of these occasions did he produce the non-negotiable warehouse receipts but such goods were shipped on bills of lading pursuant to business custom and practice.

While it is true that a dispute arose and the company wrote appellee on November 11, 1960 telling them that Blackburn did not have authority "to employ you or anyone else to perform services for our Company at our expense," yet it is also true that Sealite continued to hold Blackburn out as their agent and representative subsequent to that time as evidenced by the four sales made to customers by Blackburn. On each of such occasions Blackburn orally instructed the warehouse to deliver the goods to the customers C.O.D. This is a demonstration of a course of business conduct and action on the part of Sealite which would justify the warehouse company in believing that while Blackburn's authority might have been limited in regard to running up bills yet he still had the apparent authority to direct the shipment of goods to customers as he had previously done with the sanction of Sealite. This course of business conduct in dealings continued up until the time that the warehouse shipped the goods back to Sealite in California.

■ Apparent authority exists in law when the principal, by his voluntary act, places the agent in such position that a person of ordinary prudence, conversant with business usages, and the nature of a particular business, would be justified in presuming that the agent had the authority to perform the act in question. Chastain v. Cooper & Reed, 152 Tex. 322, 257 S.W. 2d 422 (1953); Great American Casualty Co. v. Eichelberger, 37 S.W.2d 1050 (Tex. Civ.App., Waco 1931, writ ref'd); 3 Am. Jur.2d 476.

Appellant's second point is overruled.

■ In its third, fourth and fifth points appellant contends that the court should not have *submitted* Special Issues 5, 6 and 7 to the jury because, as to Special Issues 5 and 6 there was "no evidence" to support such *submission* and as regard to Special Issue No. 7 there was "insufficient evidence" to justify its *submission*. For the reasons hereinabove stated, and from a review of the evidence above related, we

overrule these points. While it is true that the evidence concerning the directions to ship the goods back to Sealite in California, as well as with reference to Blackburn's authority, is controverted and conflicting, yet the jury had a right to evaluate and weigh the testimony which it did contrary to appellant's contention. We cannot say that the evidence concerning Blackburn's apparent authority was insufficient.

In appellant's first point of error it contends that judgment should have been rendered for it, *non obstante veredicto,* because the record demonstrates that appellee warehouse was guilty of conversion, as a matter of law. In support of its contention appellant points to the provisions of Articles 5620 and 5621, Vernon's Ann.Civ. St. of Texas, commonly known as the Uniform Warehouse Receipts Act, which was in force and effect at the time of the transaction in question.*

Art. 5620, V.A.C.S. provided that a warehouseman is justified in delivering the goods subject to the provisions of the law to:

1. The person lawfully entitled to the possession of the goods, or his agent.

2. A person who is either himself entitled to delivery by the terms of a nonnegotiable receipt issued for the goods, or who has written authority from the person so entitled either endorsed upon the receipt or written upon another paper.

Art. 5621, V.A.C.S., dealing with "delivery to wrong person," provided that where a warehouseman delivers the goods to one who is not in fact lawfully entitled to the possession of them, the warehouseman shall be liable "as for conversion" to all having a right of property or possession in the goods if he delivered the goods otherwise than as authorized by the provisions of Article 5620, subdivision 1 or 2.

Appellant contends that since the warehouse had no written authority from Sealite to deliver the goods to Transcon for delivery to Sealite that Art. 5620, V.A. C.S., subdivision 2, was not complied with and therefore conversion occurred, as a matter of law, pursuant to the terms of Art. 5621, V.A.C.S. We cannot agree with appellant for two reasons. In the case of Citizens' Nat. Bank v. Texas Compress Co., 294 S.W. 331 (Tex.Civ.App., Austin 1927, writ ref'd), the same contention was urged and denied by the appellate court. The court, in discussing subdivision 2 of Art. 5620, V.A.C.S., said:

> "The section does not provide that the warehouseman is justified in making delivery only on the written authority of the party entitled to possession; and to give it that meaning would open the door to fraud by enabling an unscrupulous owner to repudiate his express verbal authorization, and thereby reap the beneficial fruits of his own wrong—a result which would be counter to the general policy of the law. * * *

> "Our holding is that if Richardson or Buddie gave verbal instructions to the compress, the effect of which, if in writing, would authorize the compress to clear the cotton in the name of Ellis, and if Richardson's authority from the bank, either actual or apparent, was sufficient to warrant such clearing, both Richardson and the bank are bound in like manner as they would be bound had the instructions given been reduced to writing."

Secondly, the evidence in this case reveals a course of business conduct on behalf of Sealite whereby Blackburn, on behalf of Sealite, frequently gave oral instructions to the warehouse to ship goods and merchandise owned by Sealite to customers. Transfer of the warehouse receipt was not required and no question was ever raised

* The former statutes referred to as Uniform Warehouse Receipts Act, Articles 5612 to 5665, inclusive, V.A.C.S., were repealed by the Texas Legislature and reenacted as a part of the Business and Commerce Code, effective September 1, 1967. See Sec. 7.101 et seq., Business and Commerce Code, V.A.C.S.

concerning the fact that the instructions were not in writing. This course of business conduct continued through the month of December 1960 and the month of January 1961 and up to February 8, 1961, when the goods were shipped by the warehouse to Sealite, via Transcon Trucking Company pursuant to the verbal instructions of Blackburn. We believe that under these facts, and the prevailing law, appellee was not guilty of having violated the terms of the two statutes involved so that it could be held as having converted the property, as a matter of law.

Miss Taylor testified positively that she transmitted the goods, which she admitted were owned by Sealite, to Sealite in California, via Transcon Trucking Company, charges collect, on the specific instructions of Mr. Ferguson transmitted to her through his agent Blackburn. Ferguson says that this did not happen. The issue was thus drawn and the jury elected to believe Miss Taylor. There being no conversion, as a matter of law, we overrule appellant's Point 1.

Appellant's final points complain of the action of the trial court in permitting appellee to file a trial amendment in which it was alleged that Blackburn was possessed of actual or apparent authority in giving the instructions to deliver the goods to Sealite in California, and in refusing to grant appellant's motion for continuance following the filing of the trial amendment. We find no merit in either of these points and overrule the same.

■ During the trial of the case appellee requested and was granted leave to file the trial amendment. At this time appellant objected to the filing of same, claiming surprise and indicating that Blackburn was no longer with the company so that he could be produced as a witness. The court permitted the filing of the amendment and in doing so exercised his discretion pursuant

to Rule 66, Vernon's Texas Rules of Civil Procedure. We cannot say that the court in this instance abused his discretion. Gulf, Colorado & Santa Fe Ry. Co. v. Bliss, 368 S.W.2d 594 (Tex.Sup.1963); Clanahan Construction Co. v. Mills, 426 S.W.2d 265 (Tex.Civ.App., Tyler 1968, no writ). It is interesting to note that appellant completely fails to demonstrate harm as a result of the court's ruling. Following the ruling granting the filing of the trial amendment the court permitted appellant to introduce in evidence for all purposes a letter dated February 24, 1961 addressed to Mr. Ferguson from Mr. Blackburn in which he details what he knows concerning the transaction. In this letter he denies that he gave Miss Taylor instructions, or attempted to relay instructions from Ferguson, concerning the disposition of the property. So, in effect appellant was granted the privilege of having the testimony of Blackburn without appellee having the right of cross-examination.

■ As to the motion for continuance sought by appellant, same was not filed in accordance with Rule 251, T.R.C.P. The motion was orally made and did not set forth the ground therefor as required by law. Coleman v. Banks, 349 S.W.2d 737 (Tex.Civ.App., Dallas 1961, writ ref'd n. r. e.). At no time did appellant ask the court for permission to reduce the motion to writing as required by the rules. We see no error reflected in these points.

Having carefully considered all of appellant's points of error, and finding no reversible error reflected therein, we overrule same and affirm the judgment of the trial court.

Affirmed.

BATEMAN, J., disqualified and took no part in the consideration or disposition of this appeal.